# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| OPEN COMMUNITIES ALLIANCE and SOUTHCOAST FAIR HOUSING,<br><br>                    Plaintiffs,<br><br>-against-<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, and BEN CARSON, in his official capacity as United States Secretary of Housing and Urban Development,<br><br>                  Defendants. | Civil No.<br><br><br>**COMPLAINT FOR DECLARATORY AND <u>INJUNCTIVE RELIEF</u>** |

## INTRODUCTION

1.      This suit challenges a Final Rule recently published by Defendant U.S. Department of Housing and Urban Development ("HUD") that would eviscerate the federal Fair Housing Act's ("FHA") discriminatory effects standard and thereby set the clock back a half century in the fight for fair housing in the United States. Titled "HUD's Implementation of the Fair Housing Act's Disparate Impact Standard," the Final Rule (hereinafter, "2020 Final Rule") would immediately render it virtually impossible for most victims of discrimination to prevail in HUD's administrative enforcement process when alleging that they have been injured by a policy or practice with an unjustified discriminatory effect. 85 Fed. Reg. 60,288 (Sep. 24, 2020). If given deference by the judiciary, it would also close the courthouse doors to victims of discrimination.

2.      Since shortly after the FHA's passage in 1968, the discriminatory effects framework, which prohibits policies and practices that cause a disparate impact or perpetuate

1

segregation and are not justified, has provided a crucial tool for challenging structural discrimination. *See Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir. 1977); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977) (*Arlington Heights II*); *United States v. City of Black Jack, Mo.*, 508 F.2d 1179 (8th Cir. 1974). In its 2015 decision in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.* (*ICP*), the U.S. Supreme Court relied upon a unanimous body of case law, Congress's awareness of that case law when amending the statute in 1988, the statutory text of the FHA, and the purpose of the FHA to conclude that discriminatory effects claims are cognizable. 576 U.S. 519 (2015).

3.       A litany of cases challenging wide-ranging policies and practices demonstrates the vital societal importance of a robust FHA discriminatory effects framework. Targets of discriminatory effects liability include exclusionary zoning ordinances that prevent the development of affordable housing in predominantly white suburbs; public housing authority policies that prevent people of color from obtaining Housing Choice Vouchers in surrounding suburbs; and landlord policies of evicting victims for domestic violence occurring in their home, including women tenants who are survivors of domestic violence. *See, e.g.*, *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 616–20 (2d Cir. 2016) (holding that plaintiffs established a *prima facie* case that defendants' zoning policy had a disparate impact on Black and Latinx residents and perpetuated residential racial segregation); *Comer v. Cisneros*, 37 F.3d 775, 795 (2d Cir. 1994) (holding that plaintiffs had standing to challenge a suburban housing authority's residency requirement for admission to the Section 8 Voucher program); Determination of Reasonable Cause, *Alvera v. Creekside Village Apartments*, No. 10-99-0538-8 (Dep't of Hous. & Urban Dev. Apr. 13, 2001) (concluding that a "policy of evicting innocent victims of domestic violence because of that violence has a disproportionate adverse impact on women"). If organizations like

Plaintiffs Open Communities Alliance and SouthCoast Fair Housing no longer have a reasonable prospect of success in bringing these claims, the societal costs and consequences will be monumental.

4.      The 2020 Final Rule is founded on the thin pretext that changes to HUD's 2013 Final Rule, "Implementation of the Fair Housing Act's Discriminatory Effects Standard" (hereinafter, "2013 Final Rule"), 78 Fed. Reg. 11,459 (Feb. 15, 2013), are needed to ensure consistency with aspects of the Supreme Court's 2015 decision in *ICP*. That could not be further from the truth. In *ICP*, the Supreme Court confirmed the lower court consensus that discriminatory effects claims are cognizable; recognized that combatting segregation is a central purpose of the FHA; and cited the 2013 Final Rule in a manner that led the U.S. Court of Appeals for the Second Circuit to conclude that the Supreme Court implicitly adopted it. *Id.* at 527, 535–36, 542, 546–47; *see also Mhany Mgmt., Inc.*, 819 F.3d at 618.

5.      The 2020 Final Rule diverges so sharply from both the Supreme Court's decision in *ICP* and decades of lower court case law—which Congress effectively ratified through the Fair Housing Amendments Act of 1988—that it is contrary to law in violation of the Administrative Procedure Act (APA). 5 U.S.C. § 706(2)(A).

6.      First, every court to address the question has held that perpetuation of segregation claims, where proof of a violation is established through evidence of a policy or practice's segregative effect, are actionable, yet HUD purports to write such claims out of the FHA.

7.      Second, no court has ever adopted the heightened pleading standard that is imposed on plaintiffs or complainants by the 2020 Final Rule, or its burden-shifting approach.

8.      Third, every court to address the question has permitted some showing of a less discriminatory alternative in response to a defendant's justification of a challenged policy, and has

rejected the notion that a plaintiff or complainant must show that that alternative would be "equally effective" and result in "no materially greater costs" or "other material burdens" for a defendant or respondent. Indeed, upon information and belief, no defendant has been so bold as to even suggest such a standard. Yet HUD, through its 2020 Final Rule, seeks to deny plaintiffs and complainants the opportunity to show less discriminatory alternatives in many situations, and otherwise imposes new requirements on them out of whole cloth.

9.      Fourth, no court has ever held that entire categories of policies or practices that might otherwise be subject to challenge are exempt from discriminatory effects liability, yet HUD creates, again out of whole cloth, exemptions for predictive models and for actions constrained by other purported legal requirements. These have no basis in the FHA.

10.      Fifth, the 2020 Final Rule completely cuts off HUD's discretion to request civil monetary penalties for violations, simply because the claim is based on disparate effects liability.

11.      Lastly, the 2020 Final Rule violates HUD's statutory duty to affirmatively further fair housing by eliminating perpetuation of segregation claims under the FHA, and by eliminating the ability of plaintiffs to pursue most other disparate impact claims.

12.      The 2020 Final Rule also violates the APA because it is arbitrary and capricious. 5 U.S.C. § 706(2)(A). With respect to all of the changes mentioned *supra* and others, HUD consistently failed to provide a reasoned basis for its decisions. In particular, HUD has:

(a) Failed to acknowledge that its changes were, in fact, substantive changes to the discriminatory effects standard;

(b) Failed to identify changes in circumstances between the promulgations of the 2013 Final Rule and the 2020 Final Rule, respectively, that would justify the changes to the standard;

(c) Failed to relate the changes to specific language in the Supreme Court's *ICP* decision or any lower court decisions;

(d) Failed to account for the costs likely to result from the 2020 Final Rule; and

(e) Failed to adequately address public comments submitted in response to the Notice of Proposed Rulemaking that preceded issuance of the 2020 Final Rule.

13.     In addition, some of the changes adopted by HUD in the 2020 Final Rule were promulgated without proper procedure because they were not adequately described in the proposed regulation, thereby depriving the public of the opportunity to comment, and because they exceed HUD's statutory authority.

14.     Plaintiffs Open Communities Alliance and SouthCoast Fair Housing have already begun to experience injuries as a direct result of the 2020 Final Rule, and it is imminent and certain that those injuries will worsen in the absence of injunctive relief.

15.     In furtherance of their respective organizational missions, both Plaintiffs have active administrative complaints pending with HUD that address systemic violations of the FHA. Claims raised in their complaints are at imminent risk of dismissal due to HUD's elimination of perpetuation of segregation claims and the changes to the burden-shifting framework in the 2020 Final Rule.

16.     Implementation of the 2020 Final Rule will also perceptibly impair Plaintiffs' ability to provide direct counseling services to individual households, including households seeking to use Housing Choice Vouchers to move to predominantly white, high-opportunity areas, as well as to conduct outreach and education regarding fair housing issues. As a result, Plaintiffs are already being forced to divert scarce resources to less effective and more time-consuming strategies for overcoming the harmful effects of the unlawful 2020 Final Rule.

17.     Furthermore, the evisceration of the discriminatory effects standard and the elimination of any real risk of liability is already starting to affect the behavior of the types of entities, such as local governments and property management companies, that are frequently defendants or respondents in FHA lawsuits and administrative complaints. Again, this reduction in the real and perceived likelihood of consequences for discriminatory conduct is making Plaintiffs' direct services, education, and outreach less effective and more difficult, thereby requiring the diversion of resources to counteract the effects of the 2020 Final Rule.

18.     Plaintiffs seek permanent injunctive relief vacating the 2020 Final Rule and barring HUD from implementing and applying the Rule, including to Plaintiffs' pending administrative complaints. Such an order would have the effect of restoring the 2013 Final Rule as the standard governing HUD's administrative enforcement practices, ensuring a fair and workable framework for complaints alleging that policies or practices have a disparate impact on members of a protected group or perpetuate the segregation of a protected group.

## PARTIES

19.     Plaintiff Open Communities Alliance ("OCA") is a non-profit corporation located in Hartford, Connecticut. OCA's mission is to combat residential racial segregation and advance access to housing opportunity for Connecticut residents through engaging and empowering families, providing outreach and education to communities and stakeholders, researching and documenting the causes and effects of segregation, and enforcing federal and state fair housing laws. OCA also provides individual counseling and assistance to Connecticut residents using government housing subsidies to ensure that they have full access to information about available housing options in a range of neighborhoods. OCA has an established track record of developing

and implementing substantive projects, collaborations, legal challenges, and publications throughout its history.

20.     Plaintiff SouthCoast Fair Housing ("SouthCoast") is a non-profit corporation incorporated in New Bedford, Massachusetts. SouthCoast's mission is to eliminate housing discrimination and ensure equal access to housing through fair housing education, outreach, advocacy, and enforcement services in Rhode Island, and in Bristol and Plymouth Counties in Massachusetts. SouthCoast also works directly with individual clients to help them connect with resources and file formal complaints if they have been discriminated against. SouthCoast has an established record of community outreach, landlord investigation, and data collection and analysis.

21.     Defendant U.S. Department of Housing and Urban Development ("HUD" or "the Agency") is a cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f)(1). HUD promulgated the 2020 Final Rule and is responsible for its implementation and enforcement.

22.     Defendant Ben Carson is sued in his official capacity as the Secretary of HUD.

**JURISDICTION AND VENUE**

23.     This Court has jurisdiction over the claims alleged in this Complaint pursuant to 5 U.S.C. §§ 701–706, 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 28 U.S.C. § 2202.

24.     HUD's issuance of the Rule on September 24, 2020 constitutes an agency action within the meaning of the APA, 5 U.S.C. §§ 702, 704, and, therefore, the Rule is judicially reviewable. Each Plaintiff meets the definition of a "person" within the meaning of the APA, 5 U.S.C. § 551(2), and is authorized to bring suit under that statute, 5 U.S.C. § 702.

25.     Venue in this judicial district is proper under 28 U.S.C. § 1391 because Plaintiff OCA has its principal place of business in this judicial district.

## FACTUAL ALLEGATIONS

**I.      Definition of Disparate Impact.**

26.      Compared to a claim of intentional discrimination, "a plaintiff bringing a disparate-impact claim challenges practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." *Texas Dep't of Hous. & Cmty. Affairs*, 576 U.S. 519, 524 (2015) (hereinafter *ICP*) (citing *Ricci v. DeStefano*, 577 U.S. 557, 557 (2009)). A plaintiff may also challenge a policy or practice that actually or predictably perpetuates the residential segregation of members of a protected group. *See, e.g.*, 78 Fed. Reg. at 11,482; *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926 (2d Cir. 1988), *aff'd in part sub nom. Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.*, 488 U.S. 15 (1988).

27.      This type of claim can be brought to challenge facially neutral policies that have a disparate impact on members of protected classes and also to root out elements of discriminatory intent, as it "permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment." *ICP*, 576 U.S. at 540. Plaintiffs can also use disparate impact claims to challenge policies that further entrench or perpetuate segregation in certain communities. *Huntington Branch,* 844 F.2d at 938.

28.      In 2015, the Supreme Court formally recognized disparate impact claims as cognizable under the FHA, following a lengthy legislative history, as well as decades of circuit case law recognizing their availability and importance. *ICP*, 576 U.S. at 530.

**II.      Enactment of the FHA.**

29.      Not unlike the current climate in the United States, the time preceding the passage of the FHA was marked by substantial civil unrest and racial tension, directed at issues ranging from police brutality, the right to vote for Black Americans, and outrage at segregation perpetuated

8

by "unequal housing conditions and social and economic isolation." Morgan Williams & Stacy Seichnaydre in Gregory D. Squires et al., *The Fight for Fair Housing: Causes, Consequences, and Implications of the 1968 Federal Fair Housing Act*, 169 (Gregory D. Squires ed., 2018).

30.     The legacy of a variety of forms of housing discrimination considered to be licit at the time—including mortgage and insurance redlining, restrictive covenants, racial zoning, intentional segregation in the siting and occupancy of public housing, and urban renewal practices that razed predominantly Black communities—contributed significantly to this social context.

31.     Increased unrest following the assassination of Rev. Dr. Martin Luther King, Jr. placed added pressure on Congress to resolve issues of discrimination in housing that were perpetuating segregation throughout the country, resulting in the passage of the FHA in 1968. *ICP*, 576 U.S. at 540.

32.     The legislative debate in Congress over the FHA clearly demonstrates that residential segregation was a primary concern behind the law's passage. Senator Edward W. Brooke (R-MA), who co-sponsored the FHA with Senator Walter Mondale (D-MN), stated that "residential segregation [had] become central to" the country's "major domestic problems," making it "the key question" of the 1960s. 114 Cong. Rec. 2688 (1968). Senator Mondale stated that residential segregation had made it impossible "to solve the problems of de facto school segregation, slum housing, crime and violence, disease, blight, and pollution." 113 Cong. Rec. 22,841 (1967). Senator Brooke also recognized the importance of eliminating policies and practices that were "facially neutral in themselves but ha[d] profound racial effects." 114 Cong. Rec. 2688 (1968). Congress's intent, in the words of Senator Mondale, was to replace segregated living patterns with "truly integrated and balanced living patterns." *Id*. at 3422.

33. Thus, in addition to providing enforcement mechanisms for rooting out intentional discrimination in housing, "it became clear that for the FHA to be an effective tool in reversing the destructive housing patterns prompting its passage, it would need to reach the consequences of housing practices, not simply the motivation behind them." Williams & Seichnaydre, *supra*, at 170. By 1988, when the FHA Amendments were passed, "all nine Courts of Appeals to have addressed the question had concluded the Fair Housing Act encompassed disparate-impact claims." *ICP*, 576 U.S. at 535. The Supreme Court recognized Congress's awareness of this "unanimous precedent" and construed this awareness and failure to change the core text of the FHA as "convincing support for the conclusion that Congress accepted and ratified the unanimous holdings of the Courts of Appeals finding disparate-impact liability." *Id.* at 536. Given that history, described in more detail below, the Supreme Court emphasized that "recognition of disparate-impact claims is consistent with the FHA's central purpose." *Id.* at 539.

### III.   Development of Disparate Impact Case Law & HUD Interpretations.

#### A. Establishment and Development of the Burden-Shifting Framework

34. Starting shortly after passage of the FHA, courts of appeals began recognizing disparate impact claims and establishing similar standards for evaluating them.

35. In 1974, the Eighth Circuit became the first appeals court to recognize a claim of discriminatory effect, in *United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir. 1974). The Court held that a zoning ordinance that prohibited new multi-family and low-income integrated housing in a majority-white neighborhood violated the FHA due to its discriminatory effect on minorities. *Id.* at 1186.

36. Even in this very early case, a framework for evaluating disparate impact claims began to emerge. The court determined that the plaintiff first has the burden of showing that the

conduct of the defendant actually or predictably resulted in a discriminatory effect. *Id.* at 1184. The burden then shifts to the defendant to show that their conduct was necessary to achieve a compelling interest. *Id.* at 1185. The court applied several factors in evaluating whether the conduct was necessary, including whether the conduct was constitutionally permissible and whether less drastic means were available to serve the interest. *Id.* at 1186–87.

37.     Several other circuits subsequently adopted a burden-shifting framework for disparate impact claims. Despite slight variations, all required the plaintiff to establish a *prima facie* case of disparate impact, after which the burden shifted to the defendant to demonstrate a legitimate justification for the challenged policy or practice. *See, e.g.*, *Resident Advisory Bd.,* 564 F.2d at 148–49 & 149 n.37; *Huntington Branch*, 844 F.2d  at 934–39; *Langlois v. Abington Hous. Authority*, 207 F.3d 43, 49–51 (1st Cir. 2000) (holding defendant has the burden of proffering a "valid," "rational," "substantial," and "legitimate" justification, as well as the burden of showing a less discriminatory alternative).

38.     Other courts of appeals adopted a similar approach, framed as a balancing test, to disparate impact analysis. In *Arlington Heights II*, the Seventh Circuit found that Arlington Heights's refusal to rezone certain property in a manner that would allow for new low-income housing could violate the FHA if it were shown to have a disparate effect on minorities. 558 F.2d at 1288. The court identified four "critical factors" that should be weighed to evaluate a disparate impact claim: the strength of the disparate impact shown by the plaintiff; the presentation of evidence of discriminatory intent that falls short of the *Washington v. Davis* threshold for Equal Protection claims; the defendant's interest in the use of the challenged action; and lastly, whether the plaintiff is seeking to affirmatively compel the defendant to provide housing, or instead seeking to prevent the defendant from impeding property owners from providing housing. *Id.* at 1288–90;

*see also Smith v. Town of Clarkson*, 682 F.2d 1055, 1065 (4th Cir. 1982); *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n*, 508 F.3d 366, 372–74 (6th Cir. 2007); *Arthur v. City of Toledo*, 782 F.2d 565, 574–75 (6th Cir. 1986); *Mountain Side Mobile Ests. P'ship v. Sec'y of Hous. & Urban Dev.*, 56 F.3d 1243, 1252 (10th Cir. 1995).

**B. Clarification of Pleading Standards**

39.     In roughly 40 years of disparate impact jurisprudence, courts have continued to refine the pleading and burden-shifting frameworks for evaluating claims of disparate impact under the FHA.

40.     For example, although the Tenth Circuit applies a balancing test and the Eighth Circuit applies a burden-shifting standard, both have held that in showing a legitimate justification for the challenged policy, the burden of proof is on defendants to show a "manifest relationship" between the challenged policy and their interests, rather than a heightened standard of showing the policy is necessary to serve a compelling interest. *See Mountain Side Mobile Ests. P'ship*, 56 F.3d at 1254; *Charleston Hous. Auth. v. U.S.D.A.*, 419 F.3d 729, 740–42 (8th Cir. 2005).

41.     The Third Circuit has clarified that the less discriminatory alternative prong of the burden-shifting framework does not require that the alternative be equally effective to the challenged policy or practice. *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 385–87 (3d Cir. 2011).

42.     It is clear from these examples that courts have had ample time and opportunity to change, refine, or eliminate prongs of the disparate impact pleading standards. Yet none chose to raise pleading standards to the heights of the 2020 Final Rule or, to incorporate affirmative defenses that defendants can use at the pleading stage.

**C. Availability of Perpetuation of Segregation Claims**

43.     In addition to recognizing FHA claims challenging policies that have a disparate impact on members of protected classes, courts have also routinely held that policies that perpetuate segregation violate the FHA.

44.     In *Arlington Heights II*, the Seventh Circuit held that the FHA would be violated if a policy were shown to perpetuate segregation in the overwhelmingly white village. *Arlington Heights II*, 558 F.2d at 1290.

45.     In *Huntington Branch,* the Second Circuit similarly held that the city's refusal to rezone violated the FHA by perpetuating segregation. *Huntington Branch,* 844 F.2d at 939.

46.     In recognizing disparate impact claims for the first time, the Eleventh Circuit cited *Huntington Branch* when holding that claims related to a challenged policy's segregative effect are actionable. *Jackson v. Okaloosa Cty., Fla.*, 21 F.3d 1531, 1541, n.15 (11th Cir. 1994). The Eleventh Circuit reaffirmed the availability of segregative effect claims in 2009. *Hallmark Developers, Inc. v. Fulton Cty., Ga.*, 466 F.3d 1276, 1286 (11th Cir. 2006).

47.     The Third Circuit notably clarified that evidence that a policy perpetuates segregation is not needed to establish a claim of adverse impact, and that perpetuation of segregation and adverse impact are alternative claims. *Mt. Holly Gardens Citizens in Action, Inc.*, 658 F.3d at 385.

**D. HUD's 2013 Discriminatory Effects Rule**

48.     On November 16, 2011, HUD published a Proposed Rule titled Implementation of the Fair Housing Act's Discriminatory Effects Standard. 76 Fed. Reg. 70,921 (Nov. 16, 2011). In doing so, HUD elaborated on a decades-long interpretation of the FHA as allowing discriminatory effects claims. *See, e.g.*, *HUD v. Twinbrook Vill. Apartments*, No. 02-000256-8, 2001 WL

1632533, at *17 (HUD ALJ Nov. 9, 2001); *HUD v. Pfaff*, No. 10-93-0084-8, 1994 WL 592199, at *7–9 (HUD-ALJ Oct. 27, 1994), *rev'd on other grounds*, 88 F.3d 739 (9th Cir. 1996); *HUD v. Carter*, No. 03-90-0058-1, 1992 WL 406520, at *5 (HUD-ALJ May 1, 1992).

49.     The Proposed Rule reaffirmed HUD's position that discriminatory effects claims are cognizable under the FHA, laid out the burdens of proof for such claims, and defined key terms. HUD received 99 comments following the proposed rule's publication, a substantial majority of which were in support of HUD's rulemaking.

50.     On February 15, 2013, HUD published a Final Rule in the Federal Register titled Implementation of the Fair Housing Act's Discriminatory Effects Standard. 78 Fed. Reg. 11,459 (Feb. 15, 2013).

51.     The 2013 Final Rule largely retained the definitions and burden-shifting framework of the Proposed Rule. Specifically, the 2013 Final Rule adopted the burden-shifting framework used by most federal courts of appeals, placing the burden of "proving that a challenged practice caused or predictably will cause a discriminatory effect" on the plaintiff; the burden of "proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant" on the defendant; and then allowing that a plaintiff may still prevail by "proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(3) (2013).

52.     The 2013 Final Rule defined the term "discriminatory effect" as a practice that "actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a) (2013). This definition

explicitly acknowledges perpetuation of segregation claims as an independent basis for liability under the Act.

53.     In the preamble to the 2013 Final Rule, HUD responded to comments both in support of and opposing the balance it struck among competing policy and legal considerations. HUD explained that the burden-shifting standard it adopted was consistent with trends in the federal appellate case law, which had gravitated away from a balancing test, and which "does not require either party to prove a negative." 78 Fed. Reg. at 11,474.

54.     HUD rejected comments arguing that plaintiffs should have to prove that a less discriminatory alternative under the third prong of the burden-shifting framework would be "equally effective" as the challenged practice. HUD explained that the 2013 Final Rule "already states that the less discriminatory alternative must serve the respondent's or defendant's interests," that such language is consistent with Congressional and judicial interpretations of the disparate impact standard, and that such a requirement is not appropriate in the housing context where the practices covered by the FHA are "not readily quantifiable." 78 Fed. Reg. at 11,473.

55.     With respect to perpetuation of segregation claims, HUD noted that the federal courts to address the issue had been unanimous in holding that they were available, and drew from the legislative history and purpose of the FHA to reinforce the undeniable point that Congress passed the FHA in large part to eliminate and redress residential segregation. 78 Fed. Reg. at 11,469–70.

### E. *Texas Department of Housing & Community Affairs v. Inclusive Communities Project*

56.     On June 25, 2015, the U.S. Supreme Court issued its decision in *ICP*. The Court affirmed that disparate impact claims are cognizable under the FHA. 576 U.S. at 519.

57.     However, in granting the petition for *certiorari*, the Court declined to review the appropriate standard for assessing disparate impact claims. And in his majority opinion in *ICP*, Justice Kennedy did not explicitly articulate a standard for disparate impact or discriminatory effects claims.

58.     Instead, the Court's cautionary language in *ICP* focused on three main points already addressed by the body of preexisting appellate court disparate impact cases that HUD codified in its 2013 Final Rule. First, the Court emphasized that plaintiffs or complainants need to show a robust causal relationship between a challenged practice and a statistical disparity—and cannot rely on a showing of disparity, absent this evidence of causation, in order to make out a *prima facie* case. *Id.* at 542–43. Second, the Court stressed that remedies to meritorious disparate impact claims should focus on the removal of discriminatory barriers rather than the imposition of quotas. *Id.* at 544–45. Lastly, the Court stated that review of disparate impact claims should not result in the second-guessing of reasonable policy alternatives. *Id.* at 544.

59.     Notably, the Court cited HUD's 2013 Final Rule with apparent approval on multiple occasions, including with respect to aspects of the burden-shifting framework for discriminatory effects claims. *Id.* at 527.

60.     Additionally, the Court emphasized that one of the central purposes of the Fair Housing Act was to combat residential racial segregation and to promote a more integrated society. *Id.* at 529–30, 540, 546–47.

### F. Development of Post-*ICP* Case Law

61.     In the more than five years since the Supreme Court decided *ICP*, federal district and appellate courts have interpreted and applied *ICP*'s discussion of disparate impact claims in a

variety of contexts. None of their decisions, however, involved the complete reworking of the disparate impact standard that HUD adopts in the 2020 Final Rule, as challenged in this suit.

62.     For example, the Second Circuit held that the Supreme Court had implicitly endorsed the standards of the 2013 Final Rule in *ICP. Mhany Mgmt. Inc.*, 819 F.3d at 618–20. It further found that the 2013 Final Rule was entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Id* at 619. Accordingly, the court imposed on the plaintiff the burden of proving that there is an alternative policy or practice that could serve a defendant's interests with less discriminatory effect, reversing decades of circuit precedent that imposed the burden on the defendant. *Id.*

63.     Other courts of appeals have likewise affirmed the use of the burden-shifting approach articulated in the 2013 Final Rule. *See, e.g.*, *Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 510, 513 (9th Cir. 2016) (citing the 2013 Final Rule as authority for the proper burden-shifting framework, without noting any inconsistency between the 2013 HUD rule and the Supreme Court's decision in *ICP*); *Reyes v. Waples Mobile Home Park L.P.*, 903 F.3d 415, 423–24 (4th Cir. 2018) (similar). Overall, out of more than 40 federal appellate and district court decisions in disparate impact FHA cases following *ICP*, only one decision—that of the Fifth Circuit in *Inclusive Communities Project v. Lincoln Property Co.*, 920 F.3d 890 (5th Cir. 2019)—found *any* inconsistency between the 2013 Final Rule and the Supreme Court's decision in *ICP*.

The weight of case law post-*ICP* therefore supports the disparate impact burden-shifting framework that existed prior to the 2020 Final Rule.[1]

### G. HUD's Rulemaking Process, 2017-Present

64.     The current leadership of HUD has made clear from the start that they intend to undermine the scope of the FHA and its use in challenging housing policies that cause discriminatory effects, or that stand in the way of creating integrated and inclusive communities.

65.     Prior to assuming his position, in a June 23, 2015 op-ed, HUD Secretary Ben Carson attacked disparate impact liability under the FHA, along with the 2015 Affirmatively Furthering Fair Housing rule ("AFFH Rule") as "social engineering" akin to other "failed socialist experiments" like school busing. Ben Carson, *Experimenting with Failed Socialism Again: Obama's New Housing Rules Try to Accomplish What Busing Could Not*, The Washington Times (June 23, 2015) https://www.washingtontimes.com/news/2015/jul/23/ben-carson-obamas-housing-rules-try-to-accomplish-/. Notably, Carson's opinion piece also took aim at the *ICP* decision, endorsing Justice Alito's dissent regarding the "unintended consequences" of permitting disparate impact liability. *Id.*

66.     Then-candidate Donald Trump reportedly pledged that he would repeal the 2015 AFFH Rule, which obligated governments receiving federal funding to identify and address fair housing impediments in their communities. Kerry Picket, *NY Official: Trump Will Discontinue*

---

[1] Moreover, the Fifth Circuit's determination in *Lincoln Property Co.* turned on its interpretation of the robust causality requirement referenced in *ICP,* a view that HUD declined to adopt in its 2020 Final Rule. 85 Fed. Reg. at 60,313 (stating that "HUD recognizes the concerns that commenters have with the *Lincoln Property Co.* decision and does not intend to endorse the decision"). Notably, in other parts of its decision, the Fifth Circuit continued to impose the burden of showing a valid interest in the policy on defendants, and did not propose that plaintiffs bear the burden of showing that their proposed less discriminatory alternative would be "equally effective" as the challenged policy. 920 F.3d at 906, 909; *Inclusive Communities Project v. Lincoln Property Co.*, 2017 WL 2984048, *8 (N.D. Tex. 2017).

*Fed Takeover of Local Ordinances*, Daily Caller (June 8, 2016), https://dailycaller.com/2016/06/08/ny-official-trump-will-discontinue-fed-takeover-of-local-ordinances/.

67. Once the current HUD leadership assumed office, these promises to stop measures to advance fair housing were carried out. HUD attempted to suspend—without notice and comment—a rule designed to afford Housing Choice Voucher holders greater access to low-poverty communities that provide increased access to opportunity. This action was challenged successfully by Plaintiff Open Communities Alliance. *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017). Then, in 2018, HUD suspended the 2015 AFFH Rule. Notice, Affirmatively Furthering Fair Housing: Extending Deadline for Submission of Assessment of Fair Housing for Consolidated Plan Participants, 83 Fed. Reg. 683 (Jan. 5, 2018). More recently, HUD again bypassed notice and comment to issue a Final Rule dramatically gutting the AFFH Rule. *See* Preserving Community and Neighborhood Choice, 85 Fed. Reg. 47,899 (Aug. 7, 2020).

68. In writing about HUD's recent action on the AFFH Rule, President Trump echoed the well-worn but false trope that the development of affordable housing in suburban areas, presumptively linked to residential integration, would lead to decreased property values and increased crime.



69.    President Trump has consistently reinforced this message, stating that his political

adversaries "are absolutely determined to eliminate single-family zoning, destroy the value of

houses and communities already built, just as they have in Minneapolis and other locations that

you read about today. Your home will go down in value and crime rates will rapidly rise." The

White House, *Remarks by President Trump on Rolling Back Regulations to Help All Americans*,

WhiteHouse.Gov (July 16, 2020), https://www.whitehouse.gov/briefings-statements/remarks-

president-trump-rolling-back-regulations-help-americans/.

70. This hostility toward fair housing laws and enforcement informed HUD's approach to rulemaking on disparate impact under the FHA. In 2017, HUD issued a notice soliciting public comments pursuant to Executive Order 13777, Enforcing the Regulatory Reform Agenda, seeking input on what regulations the department should eliminate. 82 Fed. Reg. 22,344 (May 15, 2017). The fundamental premise of both the executive order and the notice, without substantiating evidence, was that HUD had engaged in harmful overregulation.

71. On June 20, 2018, HUD issued an Advanced Notice of Proposed Rulemaking ("ANPR") titled Reconsideration of HUD's Interpretation of Fair Housing Act's Disparate Impact Standard. 83 Fed. Reg. 28,560 (June 20, 2018). The ANPR posed six questions to the public for comment. Each of the questions posed in the ANPR was a leading question clearly framed to prompt members of the public to comment on the need to revise the 2013 Final Rule to make it more difficult for complainants to establish liability.

72. Despite this leading framing, the overwhelming majority of unique public comments on the ANPR were in support of the 2013 Final Rule and its consistency with the *ICP* decision, disclaiming any need for revisions.

**H. Promulgation of the 2020 Final Rule**

73. On August 19, 2019, HUD issued a Notice of Proposed Rulemaking titled HUD's Implementation of the Fair Housing Act's Disparate Impact Standard. 84 Fed. Reg. 42,854 (Aug. 19, 2019).

74. Again, HUD premised the need for changes to the 2013 Final Rule on alleged, but unidentified, inconsistencies between that rule and the Supreme Court's decision in *ICP*.

75. Among other changes, HUD proposed eliminating the definition of discriminatory effects, changing what plaintiffs and defendants must show at each step of the burden-shifting

analysis in ways that impose a significantly heavier burden on plaintiffs, creating multiple exemptions from liability for defendants including for discriminatory algorithms, and restricting the availability of punitive damages or civil monetary penalties.

76.     HUD received 45,758 comments in response to the 2019 Proposed Rule. 85 Fed. Reg. 60,289 (Sept. 24, 2020). The overwhelming majority of commenters opposed these changes and made several arguments for why these changes were unnecessary and violated the statute and prevailing case law.

77.     Commenters objecting to the 2019 Proposed Rule include, among many others, Plaintiff Open Communities Alliance[2]; the National Fair Housing Alliance on behalf of its members, including Plaintiff SouthCoast Fair Housing, Inc.[3]; the American Civil Liberties Union[4]; the Lawyers' Committee for Civil Rights Under Law[5]; and the Poverty & Race Research Action Council.[6]

78.     Notwithstanding these voluminous comments, on September 24, 2020, HUD published a Final Rule (hereinafter "2020 Final Rule") that shares most of the key, harmful and

---

[2] Open Communities Alliance, Comment Letter on HUD's Implementation of the Fair Housing Act's Disparate Impact Standard (hereinafter "OCA Comment") (Oct. 18, 2019), https://beta.regulations.gov/comment/HUD-2019-0067-3356.

[3] National Fair Housing Alliance, Comment Letter on HUD's Implementation of the Fair Housing Act's Disparate Impact Standard (hereinafter "NFHA Comment") (Oct. 18, 2019), https://beta.regulations.gov/comment/HUD-2019-0067-3079.

[4] American Civil Liberties Union, Comment Letter on HUD's Implementation of the Fair Housing Act's Disparate Impact Standard (hereinafter "ACLU Comment") (Oct. 17, 2019), https://beta.regulations.gov/comment/HUD-2019-0067-3539.

[5] Lawyers' Committee for Civil Rights Under Law, Comment Letter on HUD's Implementation of the Fair Housing Act's Disparate Impact Standard (hereinafter "Lawyers' Comm. Comment") (Oct. 18, 2019), https://beta.regulations.gov/comment/HUD-2019-0067-3244.

[6] Poverty Race Research Action Council, Comment Letter on HUD's Implementation of the Fair Housing Act's Disparate Impact Standard (hereinafter "PRRAC Comment") (Oct. 16, 2019), https://beta.regulations.gov/comment/HUD-2019-0067-1907.

legally unjustified provisions of the 2019 Proposed Rule. Unless enjoined, the 2020 Final Rule will go into effect on October 26, 2020.

79.     The 2020 Final Rule creates the following revisions to the disparate impact standard:

(a) Eliminates the existing definition of discriminatory effect, including perpetuation of segregation as an independent basis for liability.

(b) Requires plaintiffs to plead facts to support five elements: (1) that the challenged policy is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law; (2) that the challenged policy or practice has a disproportionately adverse effect on members of a protected class; (3) that there is a robust causal link between the challenged policy or practice and the adverse effect on members of a protected class, meaning that the specific policy or practice is the direct cause of the discriminatory effect; (4) that the alleged disparity caused by the policy or practice is significant; and (5) that there is a direct relation between the injury asserted and the injurious conduct alleged. 24 C.F.R. § 100.500(b)(1)-(5).

(c) Changes the burdens of proof, which had been set forth in 24 C.F.R. § 100.500(c) (2013), to establish that a policy or practice has a discriminatory effect by requiring that (i) a plaintiff prove by a preponderance of the evidence the elements (2) through (5) above; (ii) a defendant rebut a plaintiff's allegation under element (1) by producing evidence showing that the challenged policy or practice advances a valid interest; and (iii) in situations where a defendant rebuts the plaintiff's showing regarding the elements (2) through (5), requiring a plaintiff prove by the preponderance of the evidence either that the interest advanced by the defendant is not valid, or that a less discriminatory policy or practice exists that would serve the defendant's

interest in an "equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant." 24 C.F.R. § 100.50(c)(1)-(3).

(d) Creates a new defense at the pleading stage and subsequent stages for defendants that can show that their policy or practice was "reasonably necessary to comply with a third-party requirement" such as a "[f]ederal, state, or local law"; "[b]inding or controlling court, arbitral, administrative order or opinion"; or "[b]inding or controlling regulatory, administrative or government guidance or requirement." 24 C.F.R. § 100.50(d)(1), (d)(2)(iii).

(e) Creates another new defense after the pleading stage for defendants that can demonstrate that their "policy or practice is intended to predict an occurrence of an outcome, the prediction represents a valid interest, and the outcome predicted by the policy or practice does not or would not have a disparate impact on protected classes compared to similarly situated individuals not part of the protected class." 24 C.F.R. §  100.50(d)(2)(i). However, this defense is not adequate if the plaintiff demonstrates that an alternative, less discriminatory policy would result in the same outcome of the policy without imposing materially greater costs on or burdens for the defendant.

(f) Creates an exemption for homeowners' insurance policies and practices that have a disparate impact where the application of disparate impact liability would impair state regulation of the business of insurance. 24 C.F.R. § 100.50(e).

(g) Restricts the availability of civil money penalties. 24 C.F.R. § 100.50(f).

(h) Provides for the severability of the framework of the burdens and defenses provisions. 24 C.F.R. § 100.50(g).

80.     The 2020 Final Rule does not discuss retroactivity, and thus it presumably will apply to complaints currently pending with HUD as well as to discriminatory conduct that occurred prior to its effective date.

## THE 2020 FINAL RULE IS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW

81.     The 2020 Final Rule upends the well-established burden-shifting standard for disparate impact claims by requiring plaintiffs to allege unprecedented *prima facie* elements, creating new and onerous burdens of proof, and establishing novel defenses from liability.

82.     The 2020 Final Rule replaces the disparate impact standard recognized by the 2013 Final Rule with one that dramatically raises the bar for bringing disparate impact claims, all under the guise of complying with *ICP*. None of the changes this suit challenges, however, is required by the Court's decision in *ICP*, and HUD fails to provide adequate reasoning for the changes it makes.

83.     Most notably, the 2020 Final Rule:

(a) Eliminates liability based on a perpetuation of segregation claim, without acknowledging the change or addressing the impact on parties interested in combatting segregation;

(b) Imposes an onerous, five-part pleading requirement that, among other things, obligates plaintiffs to allege that a challenged policy or practice is "arbitrary, artificial, and unnecessary" to achieve any "valid interest"—including "profit";

(c) Abandons the well-established burden-shifting standard for disparate impact claims;

(d) Provides no opportunity for plaintiffs to respond to defendants' assertions that their discriminatory policies and practices serve valid interests by showing that there are less discriminatory alternatives to promote those interests;

25

(e) In circumstances where the rule seemingly permits plaintiffs to raise less discriminatory alternatives, obligates them to prove that the less discriminatory alternative is "equally effective" as the challenged practice and does not impose materially greater costs or burdens on defendants;

(f) Adds new exemptions to liability for defendants with no support in statute or precedent; and

(g) Sharply limits the circumstances in which HUD will seek civil money penalties against defendants in discriminatory effects cases.

84.     In promulgating the Rule, HUD did not account for the voluminous comments addressing how these changes would make it harder to advance disparate impact claims. Commenters explained that raising the burden on plaintiffs to bring disparate impact claims, and making it easier for defendants to escape liability, would result in many discriminatory housing practices and policies remaining in place. HUD fails to acknowledge or address this impact, and likewise fails to address how, in light of these challenges, the 2020 Final Rule would be more likely to reduce housing discrimination and serve the purposes of the FHA than the 2013 Final Rule.

## I.     HUD's Elimination of Liability Based on the Perpetuation of Segregation Is Arbitrary, Capricious, and Contrary to Law.

85.     The 2020 Final Rule eliminates the 2013 Final Rule's definition of "discriminatory effect," which confirmed that liability can be established under the FHA where a policy or practice either results in a disparate impact on a group of persons, or "creates, increases, reinforces, or perpetuates segregated housing patterns." 24 C.F.R. § 100.500(a).

86.     Courts have long recognized that a claim based on perpetuation of segregation is an alternative basis for liability from a claim based on disparate impact. *See, e.g.*, *Huntington Branch,* 844 F.2d at 937 ("The discriminatory effect of a rule arises in two contexts: adverse impact

on a particular minority group and harm to the community generally by the perpetuation of segregation."); *Arlington Heights II.*, 558 F.2d at 1291; *United States v. City of Black Jack,* 508 F.2d at 1184–86. For the 2013 Final Rule, HUD recognized this precedent in crafting the definition of "discriminatory effect," noting that "[t]he Fair Housing Act was enacted to replace segregated neighborhoods with 'truly integrated and balanced living patterns.'" 78 Fed. Reg. 11,460 (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972)). HUD concluded that "[r]ecognizing liability for actions that impermissibly create, increase, reinforce, or perpetuate segregated housing patterns directly addresses the purpose of the Act." *Id.* In particular, segregative-effects claims have been especially crucial against municipalities that use their land-use powers to block integrated housing developments in majority-white areas, in part because such claims can challenge a particular action as well as overall policy, and focus on harm to the community and not just to a racial minority or other protected class. *See* Robert G. Schwemm, *Segregative-Effect Claims Under the Fair Housing Act*, at 713, https://uknowledge.uky.edu/law_facpub/618 (2017). These cases comprise much of what Justice Kennedy referred to in *ICP* as the "heartland" of FHA discriminatory effects jurisprudence. 576 U.S. at 539–40.

87. In its Preamble to the 2020 Final Rule, HUD seeks to obfuscate the effect of its removal of "perpetuation of segregation" as an independent basis for liability under the Act. It claims that its removal of the phrase "perpetuates segregated housing patterns" does not change any obligation under the FHA, since perpetuation of segregation could still be "a *harm* prohibited by disparate impact liability." 85 Fed. Reg. at 60,306 (emphasis added). However, permitting evidence of segregative effect to serve as proof of injury in support of a disparate impact claim is not the same as recognizing an *independent* claim of perpetuation of segregation. HUD's removal

27

of this longstanding liability standard, its failure to acknowledge that it is changing its policy, and its failure to articulate a valid reason for doing so, is arbitrary and capricious.

88.     Further, HUD's new requirements for stating a *prima facie* case of disparate impact would undermine plaintiffs' ability to bring a perpetuation of segregation claim. Notwithstanding HUD's generic statement, the 2020 Final Rule requires plaintiffs to prove, as an element of a *prima facie* case, that the "challenged policy or practice has a disproportionately adverse effect on members of a protected class." 85 Fed. Reg. at 60,332 (to be promulgated at 24 C.F.R. § 100.500(b)(2)). This interpretation is contrary to law and HUD's previous policy, as under the perpetuation of segregation theory, the harm is to the community as a whole, and does not necessarily have a disproportionately adverse effect on a particular group. 78 Fed. Reg. at 11,469 ("[T]he Act prohibits two kinds of unjustified discriminatory effects: (1) harm to a particular group of persons by a disparate impact; and (2) harm to the community generally by creating, increasing, reinforcing, or perpetuating segregated housing patterns." (citing *Graoch Assocs.*, 508 F.3d at 378; *Huntington Branch,* 844 F.2d at 937; *Arlington Heights II,* 558 F.2d at 1290; *Hallmark Developers, Inc.* v. *Fulton County,* 386 F. Supp. 2d 1369, 1383 (N.D. Ga. 2005)). Likewise, plaintiffs may not be able to show that there is a "significant" alleged disparity, as required by the rule. 85 Fed. Reg. at 60,332 (to be promulgated at 24 C.F.R. § 100.500(b)(4)).

89.     By misrepresenting the import of its omission, HUD also ignores numerous comments attesting to the importance of preserving the perpetuation of segregation theory to combat discriminatory housing policies and advance the goals of the FHA. *See, e.g.*, OCA comment at 4–5; NFHA comment at 43–44; Lawyers' Comm. Comment; Former DOJ Officials, Comment Letter on HUD's Implementation of the Fair Housing Act's Disparate Impact Standard (hereinafter "Former DOJ Officials Comment") (Oct. 18, 2019) (on file with the ACLU); PRRAC

Comment; Leadership Conf. on Civ. and Hum. Rts. Comment Letter on HUD's Implementation of the Fair Housing Act's Disparate Impact Standard (Oct. 17, 2019) (on file with the ACLU). HUD should heed the Supreme Court's call that "[t]he FHA must play an important part in avoiding the Kerner Commission's grim prophecy that '[o]ur Nation is moving toward two societies, one black, one white—separate and unequal,'" and that the FHA has a "continuing role in moving the Nation toward a more integrated society." *ICP*, 576 U.S. at 547 (quoting Kerner Commission Report 1.).

## II.     HUD's Heightened Pleading Standard for Disparate Impact Claims Is Arbitrary, Capricious, and Contrary to Law.

90.     The 2020 Final Rule creates a nearly insurmountable pleading and burden-shifting standard for plaintiffs bringing disparate impact claims that is arbitrary, capricious, and contrary to law.

91.     *Arbitrary, artificial, and unnecessary*. HUD's requirement that plaintiffs allege that a policy or practice is "arbitrary, artificial, and unnecessary to achieve a valid interest" is contrary to law. The 2020 Final Rule's pleading requirements essentially shift the burden to the plaintiff to show that a defendant has no valid interest in the challenged policy. However, decades of precedent have established that it is a defendant's burden to demonstrate a valid interest in order to avoid a disparate impact claim. *See, e.g.*, *Langlois*, 207 F.3d 43; *Huntington Branch*, 844 F.2d 926; *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126; *Reyes*, 903 F.3d at 423-24 ; *Lincoln Property Co.*, 920 F.3d 890; *Arthur v. City of Toledo*, 782 F.2d 565; *Metro. Hous. Dev. Corp.*, 558 F.2d 1283; *U.S. v. City of Black Jack*, 508 F.2d 1179; *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d at 512-13; *Mountain Side Mobile Ests. P'ship*, 56 F.3d 1243.

92.     Likewise, in *ICP*, the Supreme Court placed this burden squarely on the shoulders of the defendant. The Court explained that "[a]n important and appropriate means of ensuring that

disparate-impact liability is properly limited is to *give housing authorities and private developers* leeway to state and explain the valid interest served by their policies." 576 U.S. at 541 (emphasis added). Although the Court mentioned that disparate impact claims are aimed at combatting arbitrary, artificial, and unnecessary laws, *id.* at 522, 540, 543–44, the Court never asserted that the *plaintiff* must allege that the challenged policy meets each of those descriptions. HUD fails to consider whether the clear alternative—requiring the defendant to prove a valid interest in the first instance—would achieve the interest highlighted by the Court in *ICP*.

93.     Additionally, HUD does not explain why plaintiffs should be required to allege that a defendant's policy or practice falls into all three categories. For example, a policy may be arbitrary and unnecessary without being "artificial"—i.e., a pretext to cover up discriminatory intent. Yet HUD does not address how challenging it will be for plaintiffs to credibly allege that challenged policies or practices possess all three flaws, even though commenters raised this specific issue. NFHA Comment at 13–16.

94.     By requiring plaintiffs to credibly allege that the policy or practice at issue serves no purpose in achieving a valid interest, HUD arbitrarily and capriciously reverses the position it took in promulgating the 2013 Final Rule, without displaying awareness of the change in position or providing good reasons for the new policy. HUD states that *ICP* does not preclude the requirement from being part of a *prima facie* case, but that does not explain why it should be included. Nor does HUD explain what was deficient in its prior reasoning, embodied in the 2013 Final Rule, that assigning the burden of persuasion on valid interest to the defendant avoided the undesirable outcome of requiring either party to prove a negative. 78 Fed. Reg. at 11,474.

95.     HUD contends that placing this burden on the plaintiff will aid in the timely resolution of frivolous disparate impact clams. But in promulgating the 2013 Final Rule, HUD

rejected that contention, reasoning that, "[g]iven how the discriminatory effects framework has been applied to date by HUD and by the courts, HUD does not believe that the rule will lead to frivolous investigations or create excessive litigation exposure for respondents or defendants." 78 Fed. Reg. at 11,472. HUD does not explain what has changed to justify its reversal in position.

96.     Further, numerous commenters raised substantial issues with HUD's proposal to require plaintiffs to allege that the policy is arbitrary, artificial, and unnecessary, including that: plaintiffs are not well positioned to know the interests served by a policy, *see* NFHA Comment at 11, 17; ACLU Comment, Lawyers' Comm. Comment; Former DOJ Officials Comment; NYC Bar, Comment Letter on HUD's Implementation of the Fair Housing Act's Disparate Impact Standard (hereinafter "NYC Bar Comment") (Oct. 15, 2019) (on file with the ACLU); there are rarely policies that do not serve some valid interest—particularly a profit interest—making it difficult for plaintiffs to get past the pleading stage, *see* ACLU Comment; and that overall, this requirement will increase the difficulty of bringing a disparate impact claim, *see* OCA Comment at 5, NFHA Comment at 16–18, ACLU Comment, Former DOJ Officials Comment, NYC Bar Comment. HUD does not address any of these problems with this first requirement, rendering its decision to require plaintiffs allege it as an element of a *prima facie* case arbitrary and capricious.

97.     *Disproportionately adverse effect.* HUD requires that plaintiffs allege that a policy or practice has a "*disproportionally* adverse effect on members of a protected class," without addressing how this requirement undermines perpetuation of segregation claims. Under a perpetuation of segregation claim, the challenged policy or practice may not have a disproportionately adverse effect on a member of a protected class, as harms of segregation may impact the whole community. *See, e.g.*, 78 Fed. Reg. at 11,469. Under the 2013 Final Rule, HUD explained that for a plaintiff to "establish a *prima facie* case of discriminatory effects liability,"

the plaintiff "must show that members of a protected class are disproportionately burdened by the challenged action, *or that the practice has a segregative effect*." 78 Fed. Reg. 11,468. HUD offers no reasoned basis for reversing its policy of recognizing such effects as sufficient for a *prima facie* case; does not consider including that additional clause; and fails to address the impact of leaving that clause out of its 2020 Final Rule.

98.    *Burdens of proof*. The 2013 Final Rule laid out a clear burden-shifting standard, in three stages. First, a plaintiff proved that a challenged practice caused a discriminatory effect (stage one). Next, the burden moved to the defendant, to persuade the decisionmaker that the challenged practice was necessary to achieve certain interests (stage two). 24 C.F.R. § 100.500(c)(1), (2) (2013). If the defendant did so, the ball moved back to the plaintiff's court, where the plaintiff had the opportunity to prove that the defendant's "substantial, legitimate, nondiscriminatory interests . . . could be served by another practice that has a less discriminatory effect" (stage three). 24 C.F.R. § 100.500(c)(3) (2013). In codifying this standard in the 2013 Final Rule, HUD explained that granting a plaintiff the opportunity to raise less discriminatory alternatives was consistent with near-unanimous precedent among the circuits, which varied only in which party had the burden of proof on that point. 78 Fed. Reg. at 11,473. HUD emphasized that giving the plaintiff this opportunity was crucial to create an "incentive" "to consider possible ways to produce a less discriminatory result"; otherwise, "[e]ncouraging covered entities not to consider alternatives would be inconsistent with Congress's goal of providing for fair housing throughout the country." *Id*.

99.    The 2020 Final Rule decimates this burden-shifting standard, replacing it with a confusing, nonlinear series of "showings" that a plaintiff must make to first plead and then prove

its *prima facie* case.[7] <u>First</u>, once a plaintiff has alleged the first element of the required five-part

pleading requirement—that a policy is "arbitrary, artificial, and unnecessary"—a defendant may

rebut the allegation by producing evidence showing the policy "advances a valid interest (or

interests)." 85 Fed. Reg. at 60,332–33 (to be promulgated at 24 C.F.R. § 100.500(c)(2)). HUD

does not explain why defendants have only the burden of production, rather than persuasion, as to

their valid interest, even though every court to address the question has held that defendants or

respondents in FHA cases have the burden of persuasion to justify their policy. Moreover, under

the 2020 Final Rule, if a defendant produces such evidence, the analysis stops there. Unlike the

2013 Final Rule, the 2020 Final Rule offers no opportunity for a plaintiff to then suggest that a

less discriminatory policy that exists. In other words, the 2020 Final Rule offers *no* pathway for a

plaintiff to move from stage two to stage three: It is simply silent on what happens after a defendant

rebuts the first element—whether the case ends; whether the plaintiff then reverts to stage one to

allege (and then prove) the remaining elements; or something else. The most natural reading of the

text would support the dismissal of the case, cutting off plaintiffs' ability to further prove their

claims.

    100.    Meanwhile, to prove a *prima facie* case, a plaintiff is required to prove, by a

preponderance of the evidence, elements (2) through (5). *Id.* at 60,332 (to be promulgated at 24

C.F.R. § 100.500(c)(1)). If a defendant rebuts the plaintiff's evidence as to elements (2) through

---

[7] While acknowledging that it cannot prescribe standards for the federal courts, HUD seems to anticipate that its new pleading requirements will in fact be adopted by them. *See, e.g.*, 85 Fed. Reg. at 60,288 (stating that the "Final Rule establishes a uniform standard" for determining FHA violations), 60,307 (attempting to square requirements with Federal Rules of Civil Procedure). Yet the pleading regime laid out by the Rule is at significant odds with the basics of civil procedure: It requires a plaintiff to plead affirmative defenses by anticipating and pleading around the "valid interest or legitimate objective" of a defendant, even before a defendant raises it. 85 Fed. Reg. at 60,332 (to be promulgated at 24 C.F.R. § 100.500(b)(1)).

(5), the plaintiff must then prove by a preponderance of the evidence either that the asserted interest(s) are not valid, or that "a less discriminatory policy or practice exists that would serve the defendant's identified interest (or interests) in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant." *Id.* at 60,333 (to be promulgated at 24 C.F.R. § 100.500(c)(3). Again, it is not clear how this series of steps interacts—or does not—with those required for the first element of the five-element pleading requirement.

101.    By splitting the familiar first stage of the burden-shifting standard into two, and then assigning separate burden shifts to each, HUD has created a confusing landscape wherein a plaintiff has the critical opportunity to offer a less discriminatory alternative *only* if a defendant successfully rebuts elements (2) through (5) of its *prima facie* case, but not if the defendant rebuts the first element alone.

102.    HUD offers no reason for reversing its policy or departing from longstanding legal precedent as to the burden-shifting standard, instead claiming that plaintiffs can still prove that there are less discriminatory alternatives. *See, e.g.*, 85 Fed. Reg. at 60,321. But that is not what the text of the 2020 Final Rule says. The text of the Rule does not give them that opportunity as part of rebutting defendants' showing of a valid interest—notwithstanding HUD's acknowledgement that the plaintiff's ability to raise the existence of a less discriminatory alternative "has been recognized consistently by courts in Title VII and Title VIII disparate impact cases." *Id.*

103.    Additionally, the public did not have an opportunity to comment on HUD's decision to strip the plaintiff of this opportunity to demonstrate a less discriminatory alternative. The proposed rule gave no indication of these changes, instead laying out three stages similar to the 2013 Final Rule: once the defendant rebuts the plaintiff's assertion that the policy is arbitrary,

artificial, and unnecessary, the defendant can produce evidence that the policy advances a valid interest, and then the plaintiff can prove by a preponderance of the evidence that a less discriminatory policy or practice exists. 84 Fed. Reg. at 42,863. HUD's edits in creating the 2020 Final Rule are inconsistent with what was proposed, which only increases the confusion.

104.    Finally—and assuming that a plaintiff can even reach the third stage—the requirement that a plaintiff prove that the less discriminatory alternative serve a defendant's interest "in an equally effective manner" is a complete reversal from the position HUD took in promulgating the 2013 Final Rule. At that time, HUD explicitly rejected the suggestion that the less discriminatory alternative proposed by a plaintiff had to be "equally effective" in serving the defendant's interests. 78 Fed. Reg. at 11,473. HUD reasoned that the 2013 Rule's language, which required the plaintiff to prove "that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect," 24 C.F.R. § 100.500(c)(3), "is consistent with the Joint Policy Statement, with Congress's codification of the disparate impact standard in the employment context, and with judicial interpretations of the Fair Housing Act." 78 Fed. Reg. at 11,473 (footnote omitted). HUD went on to reason that borrowing the "equally effective" modifier from the "superseded *Wards Cove* case, is even less appropriate in the housing context than in the employment area in light of the wider range and variety of practices covered by the Act that are not readily quantifiable," and went on to question whether "*Wards Cove* even governs Fair Housing Act claims." *Id.*

105.    Although HUD now reverses its position and adds the "equally effective" modifier, HUD does not provide credible reasons for the new policy—particularly in light of the prior considerations outlined in the 2013 Final Rule. The only reason HUD provides is that the requirement is "consistent" with *ICP*, but nowhere in the Court's opinion does it require a plaintiff

to show that a less discriminatory alternative is "equally effective" at advancing defendant's interest. The *ICP* Court does state that the FHA should not be construed "to impose *onerous costs* on actors who encourage revitalizing dilapidated housing in our Nation's cities merely because some other priority might seem preferable." *ICP*, 576 U.S. at 541. But the Court was not speaking directly to the burden-shifting framework or what standard plaintiffs must meet when advancing a less discriminatory alternative. Further, there is quite some distance between an alternative that may not be "equally effective" at achieving a defendant's interests, and one that places an "onerous" burden on defendants.

106.    HUD does not explain why it is imposing a higher standard than is even alluded to by *ICP*. Instead, it restates that its new requirement balances the relevant interests by requiring that a less discriminatory alternative "is one that will not unduly harm defendants." 85 Fed. Reg. at 60,321. Once again, there are less discriminatory alternatives that may not "unduly" harm defendants, though they may not "equally" serve their interests—and HUD neither acknowledges nor explains this gulf in its reasoning.

107.    HUD has also inserted new requirements that a less discriminatory alternative serve a defendant's interest without "imposing materially greater costs on, or creating other material burdens for, the defendant." 85 Fed. Reg. at 60,333 (to be promulgated at 24 C.F.R. § 100.500(c)(3)). HUD appears to base these added requirements solely on language from *ICP*, quoted above in Paragraph 105, that refers to the avoidance of "onerous" costs. 576 U.S. at 541. It is arbitrary and capricious to require plaintiffs to show that a less discriminatory alternative would not result in materially greater costs (or other material burdens), as that requirement is a much more difficult showing than one focused solely on the avoidance of the more severe category of "onerous" costs—and HUD has offered no reason for creating such a requirement.

### III.   HUD's Creation of Exemptions from the Disparate Impact Burden-Shifting Standard is Arbitrary, Capricious, and Contrary to Law.

108.    In the 2020 Final Rule, HUD has created two new defenses for defendants in discriminatory effects cases, separate from the burden-shifting standard laid out in 24 C.F.R. § 100.500(b)–(c). Fashioning new exemptions and attempting to weave them into the disparate impact standard is contrary to decades of jurisprudence. When challenged, HUD does not point to a single precedent wherein a court authorizes a particular defense that is not subject to the applicable burden-shifting or balancing test, instead stating without explanation that it "believes that the proposed framework is consistent with existing case law." 85 Fed. Reg. at 60,315.

109.    Instead, HUD denies that it is creating "a practice-specific exemption or safe harbor," 85 Fed. Reg. at 60,316, but does not explain its reasoning as to why the two defenses listed are not exemptions or safe harbors. If, as HUD states, "a defendant who can prove the defense has necessarily shown that the defendant cannot be liable," 85 Fed. Reg. at 60,316, HUD needs to explain why the exemptions are necessary at all, as the defendant could already avoid liability without the exemptions.

110.    Further, HUD has already spoken on the issue of exemptions. In promulgating the 2013 Rule, HUD refused requests to create explicit exemptions, noting that "creating exemptions beyond those found in the Act would run contrary to Congressional intent." 78 Fed. Reg. at 11,475 (citing *Graoch Assocs.*, 508 F.3d at 375 (explaining that "we cannot create categorical exemptions from it without a statutory basis. . . . [and] [n]othing in the text of the FHA instructs us to create practice-specific exceptions"); *see also id.* at 11,477 ("HUD notes further that Congress created various exemptions from liability in the text of the Act, and that in light of this and the Act's important remedial purposes, additional exemptions would be contrary to Congressional intent.").

HUD does not acknowledge that it is changing its policy toward the creation of exemptions, or provide any reasons for their creation in light of its past position.

111.    There are limited exemptions to the disparate impact standard listed in 24 C.F.R. § 100.10, but they all correspond to statutory exemptions. HUD does not have the statutory authority to create exemptions to the disparate impact standard out of whole cloth, and does not point to any legislative intent for it to create these exemptions specifically.

112.    The first exemption HUD creates allows a defendant to establish either that a plaintiff failed to plead facts in support of a *prima facie* case, or that a plaintiff failed to establish that a policy or practice has a discriminatory effect, if the defendant shows it was "reasonably necessary to comply with a third party requirement." 85 Fed. Reg. at 60,333 (to be promulgated at 24 C.F.R. § 100.500(d)(1), (2)(iii)). HUD lists three such requirements, including "[f]ederal, state, or local law"; "[b]inding or controlling court, arbitral, administrative order or opinion"; and "[b]inding or controlling regulatory, administrative or government guidance or requirement." *Id.*

113.    HUD's explanation of this defense is internally inconsistent, rendering its reasoning in promulgating the defense arbitrary and capricious. On the one hand, HUD states that it "believes that this defense should be permitted only when the policy or practice is *legally mandated* by a third party." 85 Fed. Reg. at 60,317 (emphasis added). HUD cites dicta from *ICP* to support the proposition that, where federal law substantially limits a defendant's discretion, a plaintiff may not have demonstrated a causal connection sufficient to make out a *prima facie* case of disparate impact. 576 U.S. at 543. Yet elsewhere, HUD avers that "[t]he defendant should not be required to show that its policy is the *only possible way* to comply with the third-party requirement, so long as its policy is reasonably necessary . . . there may have been other ways of complying with the restricting law or order." 85 Fed. Reg. at 60,290 (emphasis added). Nowhere did the Supreme

Court in *ICP* state that discriminatory effects liability should not attach where the law (or other authority) that purportedly binds the defendant is not federal in nature.

114.    This caveat means that HUD has created a defense that denies plaintiffs any opportunity to address whether, despite the third party's requirement, there were less discriminatory options available to the defendant. While the Court in *ICP* may have been concerned with ensuring that plaintiffs present sufficient evidence of a causal connection, the exemption HUD has crafted allows for defendants to escape liability while electing to move forward with more discriminatory policies and practices. HUD does not address why defendants should be exempt from such a showing, what the harm will be to plaintiffs prevented from addressing their claims by defendants invoking this defense, or how this defense advances its interest in affirmatively furthering fair housing.

115.    The second exemption was created by HUD with no opportunity for the public to comment. In the 2019 Proposed Rule, HUD crafted a defense that would apply "[w]here a plaintiff alleges that the cause of a discriminatory effect is a model used by the defendant, such as a risk assessment algorithm," and the defendant is able to show that the model's inputs do not rely on substitutes or close proxies for protected classes, but is predictive of a valid objective; that the model is produced, maintained, or distributed by a recognized third party—not the defendant; and that the model has been subjected to critical review and validated by a third party. 84 Fed. Reg. at 42,862.

116.    In response to concerns from commenters, HUD eliminated the proposed defense and replaced it with completely new language. The new exemption now permits a defendant to escape liability where:

> The policy or practice is intended to predict an occurrence of an outcome, the
> prediction represents a valid interest, and the outcome predicted by the policy or

> practice does not or would not have a disparate impact on protected classes compared to similarly situated individuals not part of the protected class, with respect to the allegations under paragraph (b). This is not an adequate defense, however, if the plaintiff demonstrates that an alternative, less discriminatory policy or practice would result in the same outcome of the policy or practice, without imposing materially greater costs on, or creating other material burdens for the defendant.

85 Fed. Reg. at 60,333 (to be promulgated at 24 C.F.R. § 100.500(d)(2)(i)).

117.   This exemption is not a logical outgrowth of the exemption for use of algorithms that was proposed. If HUD had proposed this exemption, commenters would have had the opportunity to address the confusing nature of the exemption, and concerns about its impact on plaintiffs' ability to advance disparate impact claims. In particular, commenters could have had the opportunity to address the lack of statutory authorization for such an exemption, the vague and confusing wording of the exemption, and the wide range of potentially harmful policies that could be inoculated from liability by the exemption. By inserting this exemption at the last minute, HUD deprived the public of the right to notice and comment, and did not fulfill its procedural obligations under the APA.

## IV.   Taken as a Whole, the Final Rule's Entirely New Standard Is Arbitrary, Capricious, and Contrary to Law.

118.   Taken together, the changes to the disparate impact standard that HUD would implement through the 2020 Final Rule are contrary to law as they upend a well-established standard. They are also arbitrary and capricious, as HUD fails to address its change in position or the comments addressing the harms this change will engender to those impacted by housing discrimination, and does not provide a good reason for the change. Finally, HUD does not adequately address the costs of its new Rule.

119.   While the circuits were not unanimous in articulating a disparate impact standard in advance of the 2013 Final Rule, there was a commonality to the circuits' approach that the 2013

Final Rule embraced and the 2020 Final Rule rejects. None of the circuit courts rejected a perpetuation of segregation claim, as the 2020 Final Rule does. They also did not impose a standard that simultaneously (1) puts the burden on plaintiffs to allege that a policy is arbitrary, artificial, and unnecessary; (2) denies plaintiffs the opportunity to show less discriminatory alternatives where defendants have produced evidence that the policy advances a valid interest; (3) requires plaintiffs to propose an equally effective less discriminatory alternative in the situations where they are permitted to respond to defendants' rebuttals; and (4) creates explicit exemptions from the disparate impact standard.

120.    The standard is also completely unlike the disparate impact standard recognized in Title VII or ADEA caselaw. Courts have long held that the FHA is to be interpreted in accordance with relevant interpretations of Title VII of the Civil Rights Act of 1964, which addresses employment discrimination on the basis of membership in an enumerated protected class. *See, e.g.*, *Resident Advisory Bd. v. Rizzo*, 564 F.2d at 146; *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 986-88 (4th Cir. 1984); *Graoch Assocs.*, 508 F.3d at 372-74 (holding courts should apply a burden-shifting framework based on established Title VII jurisprudence). The Supreme Court likewise recognized the connection in interpretation between the FHA and Title VII in *ICP*, noting Title VII's equivalent language and function to the FHA's. *Id.* at 520. What HUD has created and intends to implement through the 2020 Final Rule is an impermissible construction of the FHA's disparate impact standard, and falls outside the reasonable bounds of interpretation.

121.    Congress, meanwhile, was aware of the contours of the burden-shifting standard applied by the circuit courts and recognized through Title VII law when it significantly amended the FHA in 1988. Yet it declined to change the language of the FHA or reject the standards developed in the circuits, as HUD does now. Congress's ratification of the disparate impact

standard was cited by the Supreme Court in support of its holding in *ICP*. 576 U.S. at 535–36. The Court concluded that "Congress was aware of this unanimous precedent" when it amended the FHA, meaning "it made a considered judgment to retain the relevant statutory text." *Id.* at 536.

122.    HUD also invoked this history in promulgating the 2013 Final Rule. 78 Fed. Reg. at 11,467. There, HUD described the disparate impact standard it put forth as merely "formaliz[ing] that well-settled interpretation of the Act." 78 Fed. Reg. at 11,479. Yet HUD does not acknowledge its deviation from that "well-settled interpretation" in promulgating the 2020 Final Rule.

123.    Instead, HUD asserts two contradictory positions. HUD first argues that because the 2020 Final Rule allows disparate impact claims to proceed, it does not need to address the impact of its changes. But, as described above, HUD has crafted entirely new elements—without support from precedent, or justification—and has made them requirements to bring a disparate impact claim. HUD then reverses position and admits to the changes, but argues that the Rule is needed—at least in part—to conform to *ICP*. Neither position withstands scrutiny.

124.    First, as described above, *see supra* at paragraphs 4, 56–60, *ICP* does not in fact require many of the changes that HUD advances through the Final Rule. Indeed, that was HUD's original position. Following the Court's recognition of disparate impact liability under the FHA, HUD explicitly took the position that "*Inclusive Communities* is fully consistent with the standard that HUD promulgated relying on these preexisting sources of law," referring to "existing law under the FHA and Title VII." Defs. Mem. at 33, *Am. Ins. Ass'n v. U.S. Dep't of Hous & Urb. Dev.*, 74 F. Supp. 3d 30 (D.D.C. 2014), No. 13-cv-00966 (D.D.C. Aug. 30, 2016), ECF No. 65. HUD cited the Court's acknowledgment that "disparate-impact liability *has always* been properly limited in key respects," *ICP*, 576 U.S. at 540 (emphasis added), and its citation of the 2013 Final

Rule as evidence that the Court "was not calling for a significant departure from preexisting FHA and Title VII precedents." Defs. Mem. at 33–34. HUD's brief in that case goes into detail about specific provisions of the 2013 Final Rule and the Court's holding to illustrate that the 2013 Final Rule was consistent with *ICP*. HUD does not provide a good reason for changing its position from only four years ago.

125.    Second, although HUD acknowledges changes from the 2013 Final Rule, it refuses to address the *impact* of those changes. Instead, HUD repeatedly asserts that "the Final Rule still recognizes disparate impact as a viable theory of discrimination," 85 Fed. Reg. at 60,296, and then claims without proof or justification that "the Final Rule will better serve the 2013 Rule's purposes." 85 Fed. Reg. at 60,296. Yet even if the "Final Rule still allows disparate impact claims to be brought," 85 Fed. Reg. at 60,297, that does not mean that the same claims will be brought, or that they will be as effective at combatting housing discrimination. It is not enough to claim that, because "the Final Rule does not *remove* the availability of disparate impact claims to address Fair Housing Act violations," that it "does not change the societal benefits of HUD's implementation of the Fair Housing Act." 85 Fed. Reg. at 60,296 (emphasis added). The new standard completely undoes the standard established by the 2013 Final Rule. HUD cannot rest on disparate impact liability remaining an option—it must address the effect of its changes to the pleading and burden shifting standard. And HUD offers no evidence or reasoning as to why the changes it makes will better serve the FHA's goals.

126.    Additionally, HUD "acknowledges," but does not address, the numerous comments offering detailed descriptions of the negative impact the Rule will have on plaintiffs' ability to successfully challenge housing discrimination. *See, e.g.*, NFHA Comment at 2 ("The cumulative effect of these proposed changes would be to require dismissal of what should be meritorious

disparate impact claims" and "would eliminate the duty and incentive of regulated entities to seek out less discriminatory alternatives"); OCA Comment at 2, 4 (same); ACLU Comment (same); Lawyers' Committee Comment (same); New Economy Project Comment ("The proposed rule is deeply flawed. It would shift the burden of proof and impose inordinately high barriers that would make it virtually impossible to bring housing discrimination cases."); National Housing Law Project Comment ("In proposing this Rule, HUD is effectively taking away yet another potential tool that Housing Choice Voucher families can use to challenge discriminatory policies of housing providers having blanket policies of rejecting Section 8 Vouchers, particularly in low-poverty areas."); National Low Income Housing Coalition Comment ("The proposed rule would make it virtually impossible for people in protected classes to challenge a range of policies or practices that can harm them, including [h]ousing provider policies that allow only one person per room, which excludes families with children from housing that they can afford because they have to rent more expensive units."). At most, "HUD also agrees that [the Rule] will benefit banks and landlords," which means that HUD implicitly admits that the 2020 Final Rule *hurts* those plaintiffs who are suing banks and landlords for discrimination. Yet again, HUD fails to account for the impact of its changes, and specifically, for the impact of making it harder to bring disparate impact claims.

127. For example, HUD fails to address the barriers that the 2020 Final Rule erects for domestic violence survivors who face eviction because of leases and other policies that hold tenants responsible for any alleged criminal activity occurring in their household, even when they are the victim, despite the many comments filed raising this concern. *See, e.g.*, ACLU Comment at 10-12; Nat'l Women's Law Ctr., Comment Letter on HUD's Implementation of the Fair Housing Act's Disparate Impact Standard (HUD-2019-0067-3324) (hereinafter "Nat'l Women's

Law Ctr Comment") (Oct. 18, 2019) (on file with ACLU) at 24-26. HUD completely avoids the issue in its response to these comments, stating "this Final Rule leaves unchanged HUD's regulatory protections, which are separate from the Fair Housing Act" with a citation to the federal Violence Against Women Act. 85 Fed. Reg. at 60,297. It therefore ignored the commenters' point that the 2020 Final Rule restricts the ability of domestic violence survivors to rely on FHA disparate impact liability to challenge facially neutral policies that disproportionately harm women survivors. This is crucial as the protections of the FHA and Violence Against Women Act are not co-extensive, with VAWA reaching only a small subset of housing covered by the FHA.

128.    Similarly, HUD fails to address the 2020 Final Rule's burdens on vulnerable families who are disproportionately locked out of housing options by policies that reject renters with housing vouchers, create inflexible credit requirements, reduce the availability of multi-family rental units, or restrict the maximum occupancy per unit. *See, e.g.*, Nat'l Women's Law Ctr. Comment at 27; Pub. Interest Law Ctr. Comment Letter in Response to Proposed Rulemaking: HUD's Implementation of the Fair Housing Act's Disparate Impact Standard (HUD-2019-0067-2615) (Oct. 18, 2019) (on file with ACLU), at 2 n.6, 7 n.27, 11; Jared Huffman, Comment letter on Reconsideration of HUD's Implementation of the Fair Housing Act's Disparate Impact Standard (HUD-2019-0067-2355) (Oct. 16, 2019) (on file with the ACLU), at 20.

129.    For example, in a current disparate impact lawsuit alleging that a redevelopment plan to reduce multi-bedroom apartments discriminated based on familial status, under the new rule, defendants could have the case dismissed by simply pleading that the policy was necessary for a legitimate new occupancy standard. Pub. Interest Law Ctr. Comment at 10–11. Without discovery, plaintiffs would not be able to obtain the information necessary to refute the alleged objective. *Id.* Because disparate impact claims will be much less available under the Final Rule,

commenters voiced concerns that the housing market will return to "pre-1988 conditions in which one-quarter of rental housing was restricted against families with children." 85 Fed. Reg. at 60,296.

130.    Additionally, HUD shirked its responsibility to address concerns that the Rule would aid landlords who use criminal backgrounds checks to deter and refuse applicants of color in escaping disparate impact liability. 85 Fed. Reg. at 60,330. *See also* Columbia Legal Serv. Comment Letter in Response to Proposed Rulemaking: Implementation of the Fair Housing Act's Disparate Impact Standard (herein after "Columbia Legal Serv. Comment") (HUD-2019-0067-3619) (Oct. 18, 2019) (on file with the ACLU), at 3–4. The disparate impact theory is a primary tool used to hold such landlords accountable, particularly for implicit bias which is otherwise factually challenging to prove. Columbia Legal Serv. Comment, at 1, 5. By making disparate impact claims almost impossible to bring, HUD protects the use of discriminatory criminal background checks, which often have devastating consequences for families. *Id.* at 6. For example, a family with one parent with a criminal history may have to choose to split up in order to keep their children housed. *Id.*

131.    HUD's only attempt to claim that the 2020 Final Rule will actually help combat discrimination is asserting that "the Final Rule provides greater clarity on the use of disparate impact to address alleged violations in a manner that increases the rule's effectiveness so as to best eliminate discriminatory practices." 85 Fed. Reg. at 60,296. First, HUD's self-serving statement that the 2020 Final Rule "provides greater clarity" is not supported by the actual text of the 2020 Final Rule, complete with multiple complicated, yet undefined, new pleading requirements; brand-new exemptions; and a confusing burden-shifting regime that is arguably internally inconsistent and outlines multiple conflicting pathways for a case's progression. Regardless, even if it were true that the 2020 Final Rule "provides greater clarity," HUD does not explain how this alleged

"clarity" furthers the interest of the FHA in decreasing housing discrimination and segregation helps to eliminate discriminatory practices. Greater clarity in applying a burdensome rule can just as easily lead to the quick dismissal of plaintiffs' meritorious claims.

132.     Finally, HUD's regulatory impact analysis, which is required under Executive Order 12,866 because the Rule is a "significant regulatory action," impermissibly disregards evidence of significant indirect and direct costs imposed by the Rule. *See* Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993). HUD ignores the increased costs to plaintiffs and fair housing organizations of bringing disparate impact claims under the new standard, including the increased burdens on complainants who pursue administrative remedies through HUD, or the increased costs of seeking relief through the federal courts (where it may sometimes be possible to ignore the HUD standard) and thereby missing out on the benefits of HUD's administrative investigation and complaint process. *See, e.g.*, NYU Furman Center & U.C. Berkeley Terner Center for Housing Innovation, Comment Letter on HUD's Implementation of the Fair Housing Act's Disparate Impact Standard (HUD-2009-0067-2488) (Oct. 17, 2019) (on file with the ACLU) (observing that "it is particularly important that HUD consider whether any proposed regulation will result in increased or decreased access to fair housing, given that HUD's 'discretion must be exercised within the framework of the national policy against discrimination in federally assisted housing and in favor of fair housing"). HUD also does not address the costs of eliminating perpetuation of segregation claims—both because of the increased difficulty of desegregating communities, and because of the costs of continued segregation. *Id.* at 4 (noting that the failure to engage with "abundant research" on the harms of residential segregation and exclusion from housing "is a serious deficiency" in the proposed rule). Finally, HUD does not address the increased costs to organizations that fight to eliminate housing discrimination, and will now need to divert resources

to coping with the discrimination that will remain in place as it cannot be challenged under the new standard. *Id.* at 5 ("there is no doubt that fewer disparate impact claims will be brought and fewer will succeed . . . imposing significant costs on those who would otherwise be protected by the Fair Housing Act.").

## V.     The Rule Is Contrary to HUD's Statutory Obligation to Affirmatively Further Fair Housing.

133.    When Congress enacted the FHA in the immediate aftermath of the assassination of Dr. Martin Luther King, Jr. and in response to the recommendations of the Kerner Commission, it sought to replace racially segregated neighborhoods with "truly integrated and balanced living patterns." *Trafficante*, 409 U.S. at 211 (citing 114 Cong. Rec. 3422, statement of FHA sponsor Senator Walter Mondale). Consistent with this legislative purpose, in addition to barring discrimination in housing, the FHA imposed on HUD the obligation to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." 42 U.S.C. § 3608(e)(5). Effective implementation of this provision is central to the "Fair Housing Act's continuing role in moving the Nation toward a more integrated society." *ICP*, 576 U.S. at 547.

134.    As the FHA's legislative history and subsequent case law make clear, this duty to "affirmatively further fair housing" ("AFFH") requires HUD to address segregation and other barriers to fair housing in its own policies and practices. HUD's duty under the FHA requires it to "do more than simply refrain from discriminating," *N.A.A.C.P. v. Secretary of Housing and Urban Development*, 817 F.2d 149, 155 (1st Cir. 1987). Rather, HUD's duty to affirmatively further fair housing must also include taking steps "that overcome patterns of segregation and foster inclusive communities free from barriers that restrict access to opportunity based on protected

48

characteristics." 80 Fed. Reg. 42,289. This duty extends to the administration of all of HUD's grants and activities, as Congress intended, including through its fair housing enforcement.

135.     HUD honored this duty, supported by the aforementioned congressional intent and long-standing jurisprudence, with the inclusion of perpetuation of segregation claims in the 2013 Final Rule. These claims are crucial for fair housing advocates and direct service providers to hold HUD and other housing providers responsible for actions that perpetuate residential segregation and erect other barriers to inclusive housing opportunities for members of protected classes. Yet, through the 2020 Final Rule, HUD abdicated its statutory responsibilities by eliminating perpetuation of segregation as a basis for liability and making it much more difficult—impossible in some situations—to bring a successful disparate impact claim. In doing so, HUD now exempts from disparate impact liability policies and practices that perpetuate segregation or have a discriminatory impact on protected classes. It thus has authorized housing discrimination otherwise condemned by the statute and the courts, violating its AFFH obligation and undermining the very purpose and intent of the FHA.

## VI.     The Rule's Reduction in Civil Monetary Penalties Is Arbitrary, Capricious, and Contrary to Law.

136.     Under the FHA, if the administrative law judge finds that a respondent has engaged in a discriminatory housing practice, the judge may assess a civil penalty against the respondent, among other remedies. 42 U.S.C. § 3612(g)(3). The amounts vary depending on the respondent's history of violations: the penalty cannot exceed $10,000 if the respondent has no prior history of discriminatory housing practices, $25,000 if the respondent committed one other discriminatory housing practice during the prior five-year period, and $50,000 if the respondent committed two or more discriminatory housing practices during the prior seven-year period. *Id.* Further, if the discriminatory practice was committed by the "same natural person" as the prior acts, the penalties

may be imposed without regard to time limits. *Id.* The statute makes no distinction as to whether the remedies are available based on disparate treatment or disparate effects liability.

137.    The 2020 Final Rule, by contrast, completely cuts off HUD's ability to request the lower tier of civil monetary penalties if "liability is based solely on a discriminatory effect theory," and in some circumstances, cuts off the higher tier of civil monetary penalties as well. 24 C.F.R. § 100.500(f). Specifically, the 2020 Final Rule states that "HUD will seek only equitable remedies" in disparate effects cases, and will pursue civil money penalties "only where the defendant has previously been adjudged, within the last five years, to have committed unlawful housing discrimination under the Fair Housing Act." *Id.* A reasonable interpretation of this section conveys that HUD will *always* decline to request penalties available under the statute if it is the defendant's first offense and liability is based on a disparate effects claim, or if the defendant has two or more prior offenses, but they were more than five years prior to the complaint—even if they were committed less than seven years ago or by the same person. While the statute states that the judge "may" assess these penalties, the 2020 Final Rule completely cuts off HUD's discretion to request these penalties, simply because the claim is based on disparate effect liability and not disparate treatment liability.

138.    HUD states that it is "merely restating the Supreme Court's direction in *Inclusive Communities*" to focus on equitable remedies, 85 Fed. Reg. at 60,303. But the Court did not require that civil penalties be so curtailed. At most, the Court recommended that remedies "should concentrate on the elimination of the offending practice," as opposed to "impos[ing] racial targets or quotas." *ICP*, 576 U.S. at 544. Civil monetary penalties are not mentioned. Further, even though disparate effects claims do not require proof of discriminatory intent on the part of defendants, 85 Fed. Reg. at 60,304, the risk of monetary penalties can still encourage potential defendants to

conscientiously develop policies and practices to ensure that they will not have a disparate effect on particular populations. HUD does not explain how its decision to limit its own discretion as to statutorily available remedies advances its interest in combatting housing discrimination, and is not simply a gift to defendants who commit discriminatory housing practices.

**VII.   HUD Provided No Opportunity to Comment on the Severability Clause.**

139.    In the 2020 Final Rule, HUD introduced a severability clause not included in the proposed rule. HUD's inclusion of this clause without giving the public the notice and opportunity to respond violates the procedural requirements of the APA.

140.    The severability clause states that the "framework of the burdens and defenses provisions are considered to be severable." 85 Fed. Reg. at 60,333 (to be promulgated at 24 C.F.R. § 100.500(g)). However, HUD does not explain how the detailed burden-shifting standard, with interrelated provisions that refer back to each other, could be "independently applicable" if one or more provisions is found to be invalid.

141.    This change was not requested by commenters. Rather, HUD snuck in this severability provision without providing the public with proper notice to comment, thus violating the APA.

**THE 2020 FINAL RULE'S INJURY TO PLAINTIFFS**

142.    HUD's revision to the disparate impact standard is causing, and will continue to cause, substantial and irreparable injury to OCA, SouthCoast, and the Connecticut, Massachusetts, and Rhode Island residents they serve who suffer the adverse impacts of residential segregation and other forms of housing discrimination. The 2020 Final Rule forces OCA and SouthCoast to divert considerable time and resources toward mitigating the harmful effects of the rule on the individuals and communities they serve at the expense of their planned work. Additionally, OCA

and SouthCoast are engaged in multiple projects that are core to their missions, but which are frustrated by the restrictions of the 2020 Final Rule. The 2020 Final Rule has injured both of their missions and significantly impeded their ability to carry out their current activities and responsibilities.

## I.      Plaintiffs' Mission and Activities

143.    OCA and SouthCoast are non-profit fair housing organizations that seek to remedy residential racial segregation, housing discrimination, and the resulting social, educational, economic, and health disparities experienced by communities of color and other protected groups. OCA serves Connecticut residents, and SouthCoast serves Massachusetts and Rhode Island residents. Both organizations' missions and activities are carried out by a lean staff of fewer than ten employees, which includes an Executive Director, at least one attorney, and other personnel. Accordingly, they carefully plan how they will utilize their resources strategically, and do so well in advance. To fulfill their missions, both engage in research and data analysis, legal advocacy, community outreach and education, and direct housing assistance.

144.    OCA and SouthCoast work to address and combat residential segregation through substantive research and data analysis. For example, OCA has published reports examining the role that subsidized housing policies play in reinforcing the housing opportunity gap in Connecticut. OCA also has developed educational data tools to map how housing opportunity varies across the state by race and ethnicity and affects health outcomes of Connecticut residents. SouthCoast has analyzed data about and reported on the rate of source of income discrimination against tenants with Housing Choice Vouchers in Rhode Island.

145.    OCA and SouthCoast engage in legal advocacy at state and local levels to promote and enforce policies that advance housing opportunity and integration. OCA's legal advocacy has

included drafting and presenting public testimony on legislation and in administrative processes, working for state and local fair housing policies, and engaging in impact litigation. Legal advocacy relating to disparate impact and perpetuation of segregation has been a significant part of the work OCA performs; however, it expects this to change due to the 2020 Final Rule, as discussed below. OCA received funding from HUD through the Fair Housing Organizations Initiative to conduct legal investigation and enforcement efforts to address systemic and discriminatory exclusionary zoning, which disproportionately impacts several groups protected by the FHA. Similarly, SouthCoast received funding from HUD through the Private Enforcement Initiative to take legal enforcement actions that further the nondiscrimination provisions of the FHA. Both have filed pending administrative complaints with HUD, described below, under the disparate impact theory against entities alleged to have engaged in housing discrimination.

146.    OCA and SouthCoast provide community outreach, education, and training for residents, grassroots organizations, public housing authorities, municipalities, and developers throughout Connecticut, Rhode Island, and parts of Massachusetts. For example, OCA convenes a statewide coalition aimed at improving housing opportunity through grassroots advocacy and addressing exclusive municipal policies that underpin residential segregation. OCA also works with realtors, developers, and other stakeholders to identify best practices to promote integration. SouthCoast presents on fair housing and lending at classes held for first-time homebuyers and landlords. It also distributes multi-lingual brochures to public and private entities, educates them about housing referral resources for the populations they serve, and offers to collaborate on educational seminars for staff and/or the public.

147.    OCA and SouthCoast provide individual counseling and other direct services to people using government housing subsidies and other residents in their respective service areas.

For example, OCA offers counseling on a variety of issues relating to access to mobility to five to ten families with Housing Choice Vouchers annually to ensure they have access to information about available housing options suited to their specific housing priorities in a range of neighborhoods in higher opportunity areas, receive the full benefits of their vouchers, and have legal support to address any outstanding issues (e.g., back rent, prior evictions). This activity has been the smallest segment of OCA's work in the past, representing only 5% of its budget, but is expected to grow due to the 2020 Final Rule as discussed below. SouthCoast accepts housing discrimination complaints and, in follow up, conducts client intakes, refers clients to resources, and assists them in filing administrative housing discrimination complaints when appropriate.

## II.      Plaintiffs' Pending Disparate Impact HUD Complaints

148.    On August 3, 2020, OCA filed a HUD complaint challenging a Connecticut state law imposing exclusionary geographic limitations on where a Public Housing Agency ("PHA") may operate. In its complaint, OCA alleges that the state law denies housing opportunities to PHA clients, restricts the ability of PHAs to provide housing in a manner that is not racially segregated, and perpetuates residential segregation in Connecticut on the basis of race and national origin in violation of the FHA and HUD's prior regulation on disparate-impact liability. On October 19, 2020, HUD accepted the complaint for intake.

149.    On January 10, 2020, SouthCoast filed a HUD complaint against a realty management company with discriminatory practices of marketing its units specifically to students, renting single bedrooms rather than full units, and declining to show rooms to potential renters with children. SouthCoast included both disparate treatment and disparate impact claims in its complaint, as the company's practices disproportionately impact families with children, a protected group under the FHA. In follow up, HUD has conducted some fact investigation. But it

is unclear if HUD will apply the 2020 Final Rule to the complaint, and, if so, whether the disparate impact claim in the complaint will be dismissed pursuant to the 2020 Final Rule.

150.    Both complaints were filed under the 2013 Final Rule. If HUD applies the 2020 Final Rule retroactively, both of these complaints are in jeopardy. Because the 2020 Final Rule eliminates perpetuation of segregation as a basis for liability and severely increases the burden on complainants to demonstrate disparate impact discrimination, OCA and SouthCoast now face the imminent threat of HUD's dismissal of, or unreasonable delay in investigating, their pending claims.

### III.    Injuries to Plaintiffs' Activities

151.    Advancing access to housing opportunity and combatting residential segregation are central to both OCA's and SouthCoast's missions. They address the urgent needs and concerns of residents, relying in part on the option to utilize HUD's administrative investigation and complaint process to enforce FHA provisions—and specifically, HUD's implementation of the FHA's disparate impact standard and perpetuation of segregation theory of liability. HUD's 2020 Final Rule is already having and will increasingly have significant negative impacts on Plaintiffs' missions by forcing them to divert resources (including money, staff time, and personnel) away from existing and planned activities and toward mitigating the Rule's adverse effects.

152.    Even prior to implementation, the 2020 Final Rule has already required OCA and SouthCoast to expend time, resources, and personnel in responding to the Rule and its adverse effects. For example, following the publication of HUD's proposed Disparate Impact Rule on August 19, 2019, OCA expended 20 hours of staff time just to assess the impact of the proposed rule on OCA's work relating to exclusionary zoning and Housing Choice Voucher mobility, and to submit a thorough comment detailing the numerous ways that the Rule, if enacted, would

interfere with OCA's ability to fulfill its mission and harm the individuals and communities that it serves. In doing so, OCA diverted resources in order to address its partners' and communities' urgent need for information about the Rule's impacts on housing vouchers, housing opportunities, and related programs. SouthCoast has already begun planning to revise the educational resources it provides about FHA rights, including brochures and presentation curricula, to reflect the confusing changes to the rules in an accurate and comprehensible way. OCA will now need to develop educational and training materials based on the 2020 Final Rule in order to counteract its harmful effects on the organization's ability to carry out its mission. OCA will also have to revise and overhaul its Disparate Impact Policy Toolkit.

153.    OCA and SouthCoast also must now plan how they will address the discrimination reported in their respective pending HUD complaints, when they are negatively impacted by the new standards set by the 2020 Final Rule. As previously discussed, the 2020 Final Rule poses a significant and imminent threat of dismissal and/or extraordinary delay of the investigation of their pending claims. Even if HUD does not outright dismiss them, OCA and SouthCoast will be forced to expend greater resources on gathering data and information to supplement their complaints to meet the increased burdens in HUD's revised Rule. Such additional work would not be necessary but for the 2020 Final Rule's changes.

154.    OCA and SouthCoast are currently preparing for the following imminent and anticipated additional negative impacts of the 2020 Final Rule on activities that are core to their missions: (1) diverting resources away from legal enforcement actions to individualized housing counseling and support and policy advocacy; (2) chilling enforcement actions; (3) frustrating their data collection projects to document segregation; (4) increasing the burden to complete their

planned HUD-funded activities; and (5) reshaping their future funding strategies. These injuries can only be remedied by rescission of the 2020 Final Rule in its entirety.

155.    First, HUD's 2020 Final Rule is forcing OCA and SouthCoast to begin restructuring their existing programs, strategies, and budgets to shift resources toward an anticipated increase in need for individual housing services, like mobility counseling, in the populations they serve. By eliminating the perpetuation of segregation claim and drastically increasing the burden to bring a disparate impact claim, the 2020 Final Rule reduces the pressure on public housing agencies  to adopt necessary program reforms and to provide guidance on the rights of Housing Choice Voucher holders to mobility options—leaving non-profit organizations, like Plaintiffs, to fill the gap. OCA and SouthCoast have determined they must expend significant time and financial resources on sustained efforts to convince landlords, housing providers, developers, municipalities, and other stakeholders to voluntarily adopt and implement policies and practices that combat segregation because they will no longer be able to fall back on perpetuation of segregation claims for enforcement, as it was eliminated as a theory of liability, or disparate impact claims, as the burden makes bringing them practically infeasible.

156.    Shifting resources typically used or intended to be used for legal enforcement toward individualized services and policy advocacy has discernible costs. OCA estimates it will lose tens of thousands of dollars in revenue from lost opportunities to litigate enforcement actions at the same time that it will need to shift tens of thousands of dollars to policy advocacy efforts. It also estimates the clients it would have represented will lose tens of thousands of dollars in value from lost access to higher-opportunity areas. SouthCoast provides another example of how the Rule is impacting a smaller, but growing, organization. As its resources have increased, SouthCoast was positioning itself to begin filing more disparate impact complaints with HUD.

While it did not previously receive many racial discrimination complaints, it recently received an influx of such complaints. Because of the 2020 Final Rule, though, SouthCoast cannot seek relief through discrimination claims because of the barriers presented by the regulation, and instead must engage in more individualized counseling. For example, SouthCoast is working with a family impacted by a history of eviction and criminal conviction. SouthCoast might have strongly considered filing a HUD complaint on its behalf under the 2013 Final Rule, but the 2020 Final Rule renders that course of action nearly impossible. Instead, SouthCoast will likely need to provide housing counseling for the family.

157.    Second, the 2020 Final Rule will have a chilling effect on the filing of housing discrimination complaints because of the burden required to bring them and because of the confusion, ambiguity, and potential for misinformation that now chills fair housing advocates from even educating residents about their right to bring complaints. OCA also anticipates local administrative complaints will become harder to bring as a result of HUD's rule, because OCA expects Connecticut state agencies and local municipalities to adopt new rules reflecting the 2020 Final Rule. Although OCA will advocate with policy makers to discourage such action, if other agencies follow HUD's leadership, local administrative complaints will be practically unavailable as an enforcement remedy for the same reasons the HUD complaint process will be unavailable.

158.    This chilling effect is already felt. For example, SouthCoast recently engaged a client who is struggling to find housing due to an eviction and bankruptcy history. Before the 2020 Final Rule, SouthCoast would have investigated the landlords that rejected the client and possibly filed a complaint. Instead, SouthCoast is reviewing options to provide individualized housing counseling and advocate with specific landlords. Whereas a complaint would help prevent future applicants from experiencing housing discrimination by the same landlords, an individualized

solution for this client will not. Additionally, SouthCoast has cut information about filing HUD disparate impact complaints from its FHA rights presentations for fear of providing incorrect information given the uncertainties raised by the 2020 Final Rule. This harm is especially concerning at a time when a worldwide public health pandemic crisis is creating financial and subsequent housing instability for many families.

159.     A third anticipated harm from the 2020 Final Rule is that OCA's and SouthCoast's data collection projects to document segregation in the communities they serve will be frustrated. The organizations use these efforts to provide empirical research when advocating with policymakers. They also use the data to help identify trends and areas for potential legal enforcement actions. Since the 2020 Final Rule has eliminated perpetuation of segregation as a theory, this data will be less persuasive and useful because it is no longer directly tied to a legal cause of action. Before the 2020 Final Rule, the data were particularly helpful in informing challenges to exclusionary zoning policies and background checks, policies which often perpetuated segregation.

160.     Fourth, OCA and SouthCoast now face increased burdens in meeting the deliverables for their HUD-funded work. When HUD provided each organization with funding through its specific enforcement initiatives, the organizations had specific expectations for the activities the funds would be used for and the amount of resources the activities would require. OCA's activities included implementing a project to address systemic and discriminatory zoning. SouthCoast planned to pursue 40 enforcement actions and investigate one systemic housing discrimination issue annually. But now, under the 2020 Final Rule, these organizations are experiencing confusion about how these activities will result in successful enforcement actions and whether they still have sufficient resources to carry out the same number of actions using the

same strategies as originally planned. SouthCoast is interested in investigating discrimination based on criminal records as a practice with disproportionate impacts on racial minorities, but no longer knows if this would be fruitful under the 2020 Final Rule if enforcement actions are not feasible.

161.    Fifth, the Rule is forcing fair housing non-profit organizations to rethink their funding strategies. OCA specifically is facing uncertainties about its future funding because it had planned to rely on HUD funding to resource its enforcement actions. It is unclear if future HUD funding will adequately increase in proportion to the higher burden and amount of resources now needed to bring a single action because, under the 2020 Final Rule, far more initial fact investigation is now required. OCA had also planned to rely on funds resulting from successful enforcement actions, funds that will diminish substantially if it cannot bring as many enforcement actions as previously planned. For example, if it cannot bring perpetuation of segregation claims, it will lose approximately $25,000 annually. Additionally, the uncertainty and confusion created by the Rule thwart these organizations' ability to successfully communicate about their future projects and strategies to funders. For example, OCA is concerned it will not be able to fundraise for data collection and analysis to demonstrate perpetuation of segregation if such claim can no longer serve as the basis for an enforcement action. At a minimum, the uncertainty and confusion create obstacles to planning for new projects to propose to funders.

162.    HUD's 2020 Final Rule will deprive OCA and SouthCoast of the benefits of HUD's administrative investigation and complaint process for challenging exclusionary zoning and other discriminatory housing policies, forcing them to expend greater resources on developing and pursuing litigation through the judicial system or, alternatively, redistributing their resources to individual counseling and policy advocacy if they no longer have sufficient resources to bring

complaints due to the increased burden. The 2020 Final Rule's consequences will result in financial harms to OCA, and thwart SouthCoast's goal of expanding its work on disparate impact claims. The diversion of resources and frustration of current activities will impair the missions of both fair housing non-profit organizations.

163.     The above-referenced harms are ongoing and increasing in severity. These harms will become even more pronounced if HUD's Rule goes into effect.

## CAUSES OF ACTION

### COUNT I
**The Rule Is Not in Accordance with Law**
**(Administrative Procedure Act, 5 U.S.C. § 706(2)(A))**

164.     The allegations of paragraphs 1 through 163 are incorporated as though fully set forth herein.

165.     The 2020 Final Rule is contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), for the following reasons, among others.

166.     The 2020 Final Rule's changes to the disparate impact standard are contrary to well-established Fair Housing Act, 42 U.S.C. § 3604, precedent and conflict with HUD's statutory duty to affirmatively further fair housing.

167.     The 2020 Final Rule unlawfully eliminates perpetuation of segregation as an independent basis of liability.

168.     The 2020 Final Rule impermissibly requires plaintiffs to allege that a challenged policy or practice is "arbitrary, artificial, and unnecessary," despite decades of precedent establishing that it is the defendant's burden to demonstrate a valid interest, and otherwise unlawfully changes the burden-shifting framework.

169.    The 2020 Final Rule deprives plaintiffs of the opportunity to rebut defendants'

proof that a policy or practice serves a valid interest by demonstrating that a less discriminatory

policy or practice would serve that interest.

170.    In the circumstances where plaintiffs are permitted to demonstrate a less

discriminatory policy or practice would serve defendants' interest, the 2020 Final Rule obligates

them to meet an especially demanding standard. The less discriminatory policy or practice must

serve the interest in an "equally effective manner" without imposing materially greater costs on or

burdens for the defendants.

171.    HUD creates two unprecedented exemptions that are not subject to the burden-

shifting standard and would allow defendants to escape liability.

172.    The 2020 Final Rule cuts off civil monetary penalties available to HUD under the

FHA.

## COUNT II
### The Rule Is Arbitrary, Capricious, and an Abuse of Discretion
### (Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

173.    The allegations of paragraphs 1 through 163 are incorporated as though fully set

forth herein.

174.    The Final Rule is arbitrary, capricious, and an abuse of discretion in violation of

the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) for the following reasons, among others.

175.    HUD failed to adequately consider important aspects of the problem, including

whether requiring defendants to prove that a challenged policy serves a valid interest aids HUD's

stated concerns; the difficulties plaintiffs will face in alleging that a challenged policy or practice

is arbitrary, artificial, and unnecessary; the impact of HUD's new exemption that would allow

defendants to move forward with more discriminatory policies and practices than are necessary to

comply with a third-party requirement; and the increased costs associated with bringing claims under the new standard, as well as the harms that will result from the new standard.

176.    HUD failed to adequately address and resolve the Rule's conflicts and interactions with the agency's duty to affirmatively further fair housing, and the availability of civil monetary penalties under the FHA.

177.    HUD failed to provide a reasoned explanation for its reversal of longstanding policy concerning the availability of "perpetuation of segregation" as an independent basis for liability under the FHA. HUD also failed to explain its reversal in requiring plaintiffs to bear the burden of alleging that the challenged policy or practice serves no purpose in achieving a valid interest, depriving them of the opportunity to demonstrate that there is a less discriminatory policy or practice would serve defendants' stated interest, and requiring that any less discriminatory alternative to be "equally effective" at serving defendants' interest. Additionally, HUD failed to acknowledge or explain that it has reversed its position on its ability to create exemptions from disparate impact liability beyond the text of the statute.

178.    HUD failed to respond to significant comments from leading housing rights advocacy associations, legal services providers, and current and former government officials, regarding, *inter alia*, the Rule's elimination of the perpetuation of segregation theory to combat discriminatory housing policies and the harms to those impacted by housing discrimination.

## COUNT III
### The Rule Was Promulgated Without Observance of Required Procedure
### (Administrative Procedure Act, 5 U.S.C. § 706(2)(D))

179.    The allegations of paragraphs 1 through 163 are incorporated as though fully set forth herein.

180.    HUD promulgated the Rule without fidelity to procedures required by the Administrative Procedure Act, 5 U.S.C. § 706(2)(D), because, among other reasons, the Final Rule is not a "logical outgrowth" of the Proposed Rule as regards to the burden shifting standard HUD outlined, the exemption for defendants where plaintiffs allege the discriminatory effect is caused by use of a model, and the severability clause added to the final rule. *See Nat'l Black Media Coal. v. FCC*, 791 F.2d 1016, 1022 (2d Cir. 1986).

181.    Agencies must describe "with reasonable specificity" any proposed changes to a regulation because a "[g]eneral notice that a new standard will be adopted" violates the notice-and-comment requirements of the APA. *Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 170 (2d Cir. 2013). Because of this procedural defect, commenters, including Plaintiffs, were deprived of the opportunity to weigh in on HUD's new burden-shifting standard, exemption for using predictive models, and severability clause.

## COUNT IV
### The Rule Exceeds Statutory Authority
### (Administrative Procedure Act, 5 U.S.C. § 706(2)(C))

182.    The allegations of paragraphs 1 through 163 are incorporated as though fully set forth herein.

183.    The Final Rule is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA, 5 U.S.C. § 706(2)(C), because, *inter alia*, the FHA does not delegate authority to HUD to promulgate exemptions from liability under the Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a) Enter a declaratory judgment that the 2020 Final Rule violates the Administrative Procedure Act and the Fair Housing Act;

(b) Issue preliminary and permanent injunctions precluding the implementation or enforcement of the 2020 Final Rule;

(c) Enter vacatur of the 2020 Final Rule;

(d) Direct HUD to take all affirmative steps necessary to remedy the effects of the unlawful conduct described herein and to prevent similar occurrences in the future;

(e) Award Plaintiff's attorneys' fees, costs, and expenses and any interest allowable by law under 28 U.S.C. § 2412; and

(f)  Grant such other and further relief that this Court deems just and appropriate.

Dated: October 22, 2020

Respectfully submitted,


*/s/ Elana Bildner*
Elana Bildner (ct30379)
Dan Barrett (ct29816)
ACLU Foundation of Connecticut
765 Asylum Avenue, 1st Floor
Hartford, CT 06105
Telephone: (860) 471-8475
e-filings@acluct.org

Sandra S. Park*
Lindsey Kaley (admitted *pro hac vice*)
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 519-7871
spark@aclu.org
lkaley@aclu.org

Thomas S. Silverstein*
Sarah Carthen Watson*
Lawyers' Committee for Civil Rights
Under Law
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
tsilverstein@lawyerscommittee.org
swatson@lawyerscommittee.org

Philip Tegeler (ct05515)
Poverty & Race Research Action Council
740 15th Street NW, Suite 300
Washington, DC 20005
Telephone: (202) 360-3906
ptegeler@prrac.org

Brian Corman*
Joseph M. Sellers*
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
Suite 500, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
bcorman@cohensmilstein.com
jsellers@cohenmilstein.com


*Attorneys for Plaintiffs*

*Motions for *pro hac vice* forthcoming